# CHARLESTON.

## LE COMTE *v* FRESHWATER.

Submitted June 10, 1904—Decided November 29, 1904.

1. EQUITY JURISDICTION.—*Boundary Lines.*
   Though equity will not entertain a suit only to settle boundary and title to land, yet when there is an independent ground giving equity jurisdiction, it will entertain the suit and pass on the title or boundary as incidental to other relief.    (p. 340).

2. ESTOPPOL.—*Position in Court.*
   When one takes a position in a judicial proceeding, and a decree is made conformable thereto, and another party relies upon it, and acquires property under the decree, he that takes such position is estopped from afterwards claiming contrary to such position to the prejudice of the other party.   (p. 341).

3. EQUITY—*Mistake in Lease—Correction.*
   Where a decree directs the lease of a tract of land for oil and gas, and the lease under it contains a line or boundary different from that authorized by the decree, omitting a part of the tract, either from fraud or mistake, the lessee being ignorant of the physical effect of the line as a fact, equity will reform the lease.   (p. 342).

4. DISPUTED BOUNDARY—*Oral Agreement.*
   To make valid an oral agreement to fix a line between two

contiguous tracts of land there must be doubt and uncertainty as to the true place of the line, else the agreement is void. Where there is in fact, under the facts, such doubt and uncertainty, such oral agreement, if at once carried into execution by actual possession, is valid without other consideration than the settlement of disputed boundary.   (p. 343).

Appeal from Circuit Court, Hancock County.

Bill by A. C. Le Comte against Martin L. Carson and others. Decree for plaintiff, and defendants appeal.

*Affirmed.*

John R. Donehoo, for appellants.

Erskine & Allison, for appellee.

Brannon, Judge:

Martin L. Carson and Samuel H. Carson were owners of a tract of 140 acres, one rod and twenty-seven poles of land in Hancock county, which they acquired by two deeds from the devisees of Wilcoxen. It is called "the Wilcoxen tract." Samuel H. Carson died leaving a widow, Amanda I. Carson, and infant children, of whom Amanda became guardian. The two Carson brothers made an oil lease to Murray for forty acres of the tract. A. C. Le Comte, after this lease, and after the death of Samuel H. Carson, negotiated with Martin L. Carson and Amanda Carson, guardian of the children of Samuel H. Carson, for an oil lease for the unleased residue of the Wilcoxen tract.   To secure good title for the interest of the infants it was agreed that a petition should be filed in the circuit court of Hancock county by said guardian against said infants to secure a decree enabling the guardian to sell or lease the oil and gas interests of the infants, and such petition was filed and such decree was obtained. The petition stated that Martin L. and Samuel H. Carson had derived title to the tract from said Wilcoxen devisees, and stated said former lease to Murray of part of the tract, and prayed a decree to give her authority to lease and sell the oil and gas in "the said unleased 100 acre tract." The petition stated that Martin L. Carson owned one-half, and averred that to accomplish a lease it would be necessary that he join in it, and the decree asked by the petition was one giving authority to the guardian to join in a lease with Martin L. Carson.   The decree in terms provided

for such joint lease. The petition distinctly alleged that he consented to join in such proposed lease. He was made a party and filed an answer distinctly admitting the facts stated in the petition as true, and stating that the averments of the petition that he would join in any lease or sale the guardian might make were true, and he agreed in the answer to so join. The decree allowed the leasing of "the tract and premises described in the bill." Under the decree the guardian and Martin L. Carson executed to Le Comte a lease of oil and gas. This lease, in its description of the land, does not give the boundary by magnetic calls as in the deeds by which the Wilcoxen devisees conveyed the tract to the Carsons, but bounded it by adjoining tracts, saying that on the south it was bounded "by the county road leading from Fairview to Frankfort." The boundary shown by the deeds from the Wilcoxens to the Carsons does not bound on or call for this road, but crosses it and leaves a strip or parcel south of and on the other side of the road from the body of the land of four acres, two roods and two poles; in other words, this call cuts off that strip from the body of the land and thus excludes it from the lease. James Carson, father of Martin L. and Samuel H. Carson, owned a tract of one hundred and eighty-two acres adjoining the Wilcoxen tract on its south, and thus adjoining said strip, which one hundred and eighty-two acre tract is called "the Carson Home Farm." James Carson willed this one hundred and eighty-two acre tract to five of his sons, one of them being said Martin Luther Carson, and Samuel H. Carson being another. Some days before the lease from the guardian and Martin L. Carson to Le Comte, Martin L. Carson and E. A. Freshwater took from the James Carson devisees and Amanda I. Carson as guardian of the infant children of Samuel H. Carson an oil lease for thirty-five acres of the James Carson one hundred and eighty-two acre "Home Farm," giving its northern boundary as the Fairview and Frankfort road, thus including the said strip in the thirty-five acre lease. This strip of four and a fraction acres is the bone of controversy in this case between Le Comte on the one side, and Martin L. Carson and Freshwater on the other. This lease to Carson and Freshwater was on record before the lease to Le Comte was made. James Carson had a son called "Mack". He got no part of the home farm under his father's will; but his father gave him leave to occupy a house on

that farm under an oral lease and confirmed it in his will till a
legacy to that son should fall due. This lease or license included
a few acres of land around the house, part of said home farm.
It is claimed, and some evidence goes to show, that James Car-
son told Mack that he might make use of the controverted strip
and that Mack fenced in with his other land about one-third of
this strip, and cultivated it and planted fruit trees upon it. The
balance of the strip was left in woods, without any fence separat-
ing it from said road, but a fence cut it off from
the home farm. The defendants in this present case set up
that at the time of the guardian's proceeding in the circuit
court to lease the land said disputed strip was not a part of the
Wilcoxen tract, but had been eliminated from it. They say that
in 1880 there was a dispute as to the lines between the Wilcoxen
tract and the James Carson home tract, and that in that year
James Carson and his two sons, owners of the two tracts, orally
agreed that the Fairview and Frankfort road should be thereafter
the boundary, and that this oral agreement had been ever since
acquiesed in and operated to give the disputed strip to the one
hundred and eighty-two acre tract. Under the lease of the thir-
ty-five acres to Martin L. Carson and Freshwater an oil well was
bored within two feet and three inches of the south line of the
Wilcoxen farm, and thus within that distance of said disputed
strip, a part of the derrick of the well resting on the strip; and
they began work for boring another well on the strip. Le Comte
then filed a bill in equity claiming that the insertion of the call
for the Fairview and Frankfort road in the lease to him was a
fraud upon him, chiefly worked by Martin L. Carson in giving
the draftsman of the lease that road as part of the boundary, and
causing its insertion in the lease, he, Le Comte, not knowing
that a part of the tract was thus excluded from the lease; that
at any rate the lease misrepresented the decree authorizing the
lease, and did not give him the rights he bargained for before the
decree and which the decree intended to confer. The bill asked
that Carson and Freshwater be enjoined from further drilling
the well which was on, or the derrick of which encroached on said
strip of four acres, two rods and two poles of the Wilcoxen tract;
that the lease to Carson and Freshwater be held void so far as it
covered said strip; and that they be enjoined from interfering
with Le Comte's use of said strip, and that the lease to Le

Comte be reformed and a new lease executed including all the Wilcoxen tract not leased to Murray. A decree was pronounced enjoining Carson and Freshwater perpetually from drilling or operating for oil or gas on said strip, and from interfering with Le Comte in his drilling and operating on said strip. Carson and Freshwater appeal.

Counsel for the appellants contest the jurisdiction of equity to entertain the case, because it is only a suit involving adverse titles or boundary, of which equity will not take jurisdiction, on principles stated in *Freer* v. *Davis,* 52 W. Va. 1. The ready answer to this objection is found in that and many other cases,— that the rule that equity will not hold a case to try adverse titles to land is, that it applies only "when the plaintiff has no equity against the party claiming adversely to him." When there is another ground for jurisdiction, independent of a trial of the hostile titles, one which alone gives jurisdiction, equity takes it and tries the whole case. Here the bill alleges fraud in the execution of an erroneous lease, or a mistake in its drafting, and failure to execute intent of the parties and to conform to the decree, and prayed a reformation of the lease, these being proper grounds for equity jurisdiction, to undo a fraud, correct a mistake, reform a deed.

On the merits. We can safely say that Le Comte, who came just then from Ohio and was a stranger in Hancock county, did not know the location of the lines, the physical boundary of the land, so far as to know that the call for the Fairview and Frankfort road inserted in the lease would leave out a part of the Wilcoxen tract. He did know that such call was being inserted in the lease, but that did not tell him that it would lose him the strip in controversy. Suppose he had the deeds to the Carsons before him giving the magnetic calls S. 55 E. and S. 75 1-4 E.; how could he say whether or no the road conformed to those calls? But Amanda Carson and Martin L. Carson well knew that that road call did not conform to the calls of the deed. Amanda says as a witness that she well knew it, but was not allowed to say so, and admits under oath Le Comte's right to the disputed territory. Martin L. Carson directed this road call to be put in the lease, and does not pretend ignorance of its departure from the calls of the deed or of its leaving out the disputed strip. He intentionally omitted it. Le Comte knew noth-

ing practically of the boundary.  Martin L. and Amanda knew
all about it.  He relied on them to give true bounds, and had
right to do so.  He had in the preliminary contract bargained
with them that for his large bonus of $5,000 he would get *all*
the Wilcoxen tract, except that before leased to Murray.  He
dreamed not that any part of the tract, as owned by the lessors,
would be cut out.  Why did not Martin L. Carson tell him that
the boundary did not cover the strip?  Carson must have known
that Le Comte relied on getting all except the part under Mur-
ray's lease.  Consider the record of the proceeding to lease the
land.  The guardian's petition asked that the tract, except that
part leased to Murray, be leased, and described the land as that
conveyed to the Carsons by two certain deeds, and filed them, and
they give boundaries not calling for the said road, but crossing
it and including in the tract this disputed parcel, as even Martin
L. Carson does not deny, and as the petition for appeal confesses.
That was the land which the petition asked for leave to lease.
Those very deeds and those very calls in them are parts of the
petition descriptive of the land.  By his answer Martin L. Car-
son agreed to the leasing of all the land covered by the calls of
those deeds, save the Murray lease.  He said that the petition
properly described the land.  He made no exception in his an-
swer of that strip.  If he had any claim to it as part of the other
tract, why did not his answer set it up and exclude it from the
contemplated lease?  I should regard this answer as an estoppel
forbidding him from harming Le Comte.  He neither in nor out
of court warned Le Comte of the exception of this strip.  *N. &
W. R. Co.* v. *Perdue,* 40 W. Va. 442.  "An admission in a judicial
proceeding, whether direct or by inference from the position as-
sumed, the relief sought or defense set up, will estop the one
who makes it from subsequently asserting any claim inconsistent
therewith."  4 Am. & Eng. Dec. in Eq. 304 and 196.  "Where a
party assumes a certain position in a legal proceeding, and suc-
ceeds in maintaining it, he cannot thereafter simply because his
interests have changed, assume a contrary position, especially if
it be to the prejudice of a party who has acquiesced in the posi-
tion formerly taken by him."  *Davis* v. *Wakelee,* 156 U. S.
689.  To same effect *Daniels* v. *Tearney,* 102 U. S. 415; 11 Am.
& Eng. Ency. L. (2 Ed.) 446; opinion in *Weston* v. *Ralston,* 48
W. Va. p. 186.  Martin's interest now is to keep the strip in his

own lease. He agreed to the prayer of the bill, asked it, got his prayer, and cannot now retract. He asked that the land be leased by the description in those deeds.

To what is Le Comte entitled tested by the decree? It adjudged that it would promote the infants' interests to lease "the tract and premises described in the bill." We have seen what that was. It decreed that Carson join in such lease, because he consented to do so. It is true that the guardian in her report of the lease filed it, and the decree of confirmation confirmed that particular lease, and as it bounded the lease on the road, it is limited by it; but the decree did not authorize a lease of only a part; and besides, the report told the court that the lease, was "in all respects in accord with said decree;" and the decree of confirmation proceeded upon that idea. Le Comte relied upon it and accepted the lease on the faith of it, and neither he nor the court knew the physical fact that the road call departed from the deed call and left out the disputed piece of land. It would take a survey to tell it. We can say that the court intended and Le Comte intended to lease and acquire all the land which the decree authorized to be leased. It thus seems that the omission from this lease of the land in controversy was a wrong on the part of the lessors, in law a fraud on Le Comte. Is Le Comte entitled to relief on the theory of mistake, in that the lease does not carry out intent? In such case the mistake must be mutual, and it may be said that as the lease bounds by the road, Martin L. Carson did not intend to lease by the lines of the deed, though Le Comte did. Were that all, there would be doubt; but the record of the guardian's proceeding and Carson's answer assenting to the lease proposed, make a contract between the lessors and the lessee, and the lease does not execute it, and Le Comte has right to have it executed by the reformation of it to conform to the decree of lease, to which both the guardian and Carson assented. And if he deem it essential, he can yet ask a new lease, as the court has not in terms decreed such reformation.

Next as to the defense that the land in dispute had ceased to be part of the Wilcoxen tract and become part of the Home Farm by an agreement between Carson and his two sons. This cannot avail Martin Luther Carson because of the estoppel above stated. But how as to Freshwater? How as to Carson, if he were not so estopped? One answer to this defense is, that the

oral agreement is of no force for want of consideration. True, where there is uncertainty as to location of a boundary line between coterminous owners, and a dispute based on colorable uncertainty, there may be a valid agreement resting on that uncertainty to fix a line, and no other consideration is needed. It is then held not a sale or conveyance by word prohibited by the statute that requires a writing or deed for the sale or conveyance of land, as it merely defines or locates the line. But were there is no such uncertainty, no dispute based on uncertainty, but the true line is known, or readily ascertainable, it is nothing but a transfer without that consideration, and unless written is void. As an agreement it has no consideration to call for enforcement and the statute requires a writing because it is a transfer of land, simply a transfer. 4 Am. & Eng. Ency. L., (2 Ed.) 860, 861. "In order to the validity of a parol agreement establishing a boundary, it is necessary, however, that there be doubt and uncertainty as to its true location." 5 Cyc. 932; *Pasley* v. *English,* 5 Grat. 141. The evidence in this case shows no uncertainty. If James Carson ever made any claim to this strip, there is not the least show of how he claimed. Indeed, there is no showing of controversy save a mere declartion by one or two witnesses. There is no uncertainty as to the boundary of the Wilcoxen tract or the home farm apparent. There is clearly no basis for any agreement which, of its own force as an agreement, can operate to take from the Wilcoxen farm this strip.

Further: Even if there had been such uncertainty of boundary, the evidence does not show that the agreement was executed by actual possession; for our law is stated thus in *Teass* v. *City,* 38 W. Va. 1: "Disputed boundaries between two adjoining lands may be settled by express oral agreement, executed immediately and accompanied by possession according thereto." No possession was taken immediately, nothing done to execute the agreement. It is true Mack Carson in an indefinite way says he heard this agreement and "they" told him to clear out the strip; but it is not clear on the whole evidence that what he did was to execute the agreement. What did he do? He cleared a part of the strip and fenced it, one-third of it, and left the balance out in common not fenced. There being no color of title, possession of part would not be possession of the entire strip; at most, it would only extend to the part fenced in.

But, in any view, there ought to be clear, convincing evidence to prove an agreement to take away land, and the competent evidence is not clear, is wholly unsatisfactory, unconvincing. So the circuit judge held, and we do not see that he is wrong. There is a witness who says Samuel H. Carson admitted the agreement; there is another who says he claimed the strip. Two papers go to repel the existence of such agreement. The will of James Carson describes the home farm as 182 acres, conveyed to him by a certain deed. It does not cover the strip. An unrecorded deed from Samuel H. Carson to Martin L. and James A. Carson for Samuel's interest in this land in describing the land follows the call of the deeds by which Martin and Samuel acquired the land and declares that those calls make a line running with the James Carson home farm. This is a declaration and admission by Samuel and Martin L. Carson in October, 1887, seven years after the pretended oral agreement, that the strip was a part of the Wilcoxen tract. I have used the words "pretended agreement," for it does seem to one reading the voluminous case that this agreement is hatched out lately to answer the necessity of this case.

The statute of limitation does not seem to enter into the case. It could only arise as to the little piece cultivated by Mack Carson; but it is not clear that it was held with the intent to claim title, a necessary element of the statute.

We are told that the possession of the fraction of this strip was notice to Le Comte of adverse claim, as possession is notice. It would go no further than the fraction. There was no possession of the balance. Possession is notice of a claim; but it does not create title, or make no title a good one. It is notice only of such right as the party has. If the oral agreement were clear and valid, it would be notice of it; but it is not clear and good.

The fact that the lease of the defendants was prior in time, and recorded before Le Comte's lease is immaterial. If the defendants' lease passed no title, what does its priority of date amount to? A record of a deed that passes no title does not operate as notice to affect an adverse claimant of the true title. It has no application to an adversary owner of another right but only between prior and later purchasers or creditors of the same title.

Decree affirmed.                                      *Affirmed.*