## Richmond.

### WOOLFOLK AND OTHERS V. GRAVES AND OTHERS.

January 12, 1911.

Reheard January 25, 1912.

Absent, Harrison, J.

1. EQUITY PRACTICE—*Allegation of Title to Land—Paper Title—Adverse Possession—Title Papers.*—Where one claims land under a paper title he should generally exhibit his title papers or copies thereof, or such of them at least as will make out a *prima facie* case of title; but where the bill alleges not only a paper title, and exhibits title papers evidencing the same, but alleges adverse possession of the land, and recites facts showing that the acts of ownership done thereon constitute adverse possession for the statutory period necessary to ripen his possession into a complete title, the general rule obtaining where the claim to the land rests upon a paper title does not apply.

2. INJUNCTIONS—*Trespass—Irreparable Injury—Destruction of Subject.*—When the bill states facts that show that a threatened trespass, if not prevented, will result in irreparable damage, or is in character or tendency destructive to the inheritance, or that which gives it its chief value, an injunction will be granted, notwithstanding a dispute or even a pending litigation as to title.

3. EQUITY JURISDICTION—*Complete Relief—Administering Legal Remedies.*—Where a court of equity has properly acquired jurisdiction on equitable grounds, it will, in order to prevent a multiplicity of suits, go on to do complete justice, though in doing so it has to try title, or settle boundaries, and administer remedies which rightly pertain to courts of law.

4. INJUNCTIONS—*Trespass—Allegation of Title and Possession—Case in Judgment.*—The allegation of a bill to enjoin a trespass that the complainants were the owners of the land in question (stating clearly the derivation of their title), and that they have been for over thirty years in possession of the land, and have used it for the production of timber for keeping up the fences and buildings on the cleared portion of the farm, and that the defendants well knew the location of the boundaries of the land so used by the complainants, is not a conclusion of law, but a statement of facts from which possession in the complainants is necessarily to be inferred.

5. BOUNDARIES—*Opinion of Surveyor—Statement of Facts—Case in Judg-
   ment.*—The opinion of a surveyor, unsupported by other evidence, as
   to the identity of a tract of land, unless he also states some fact or
   facts by which the court can determine the location of the land, is
   clearly insufficient to enable the court to locate the same. In the
   case in judgment, the physical facts contradict the location of the
   disputed line where the surveyor for the defendants located it. In
   addition to this, the location of the line as claimed by the complain-
   ants was known of and acquiesced in by the defendants four or five
   years prior to the present controversy, and was not controverted in
   any way until shortly prior to the institution of the present suit.
6. BOUNDARIES—*Natural Objects—Courses.*—In locating the boundaries
   of land, natural land marks take preference over courses and distances.
7. EQUITY PLEADING—*Prayer for Special and General Relief—Extent of
   Relief Granted.*—Where the complainant prays for special and also
   for general relief, if the special prayer is such that no relief can be
   granted under it, the court may, under the prayer for general relief,
   grant any proper relief consistent with the case made by the bill; hence
   the complainant can never properly and safely omit the prayer for
   general relief.
8. EQUITY JURISDICTION—*Injunction—Prayer for General Relief—Complete
   Relief—Case in Judgment—Jury Trial.*—Where a bill alleges that the
   complainants have title to the land in controversy, showing how they
   derived it; that they have been in possession thereof for over thirty
   years, using the timber on a part of it to keep up the fences and build-
   ings on the cleared part; that the timber constitutes the chief value
   of the land in controversy, and that its destruction would result in
   irreparable injury; that the defendants are probably insolvent, so
   that a judgment at law against them for damages would be of no avail,
   and prays for an injunction restraining and enjoining the defendants
   from cutting and removing the timber therefrom until they establish
   their title, upon proof of the facts alleged, it is proper for the court not
   only to perpetuate the preliminary injunction to enjoin the trespass,
   but also to go on and adjudge the rights of the parties and settle the
   title between them, and thus afford complete relief in that suit. In
   such case, although the defendants assert title to the land, they are
   not entitled to a trial of the issue by a jury, when it appears that their
   claim is not *bona fide.*

Appeal from a decree of the Circuit Court of Spotsylvania
county. Decree for the complainants. Defendants appeal.

*Affirmed.*

The opinion states the case.

*Gordon & Gordon* and *S. P. Powell,* for the appellants.

*Carter & Carter*, for the appellees.

CARDWELL, J., delivered the opinion of the court.

In July, 1906, E. M. Graves and Daisy E. Griggs, her daughter, filed their bill in this cause against Lucian Comfort and Samuel Woolfolk, in which they allege that B. F. Graves, the husband of E. M. Graves, and father of Daisy E. Griggs, departed this life about the year 1885, and that by his last will and testament, duly probated in Spotsylvania county court, he devised the "Home Place," containing about 375 acres of land, to his said wife for life, with remainder to said Daisy E. Graves and W. W. Graves, and that the latter had conveyed his one-half interest in remainder in said land to his mother, the said E. M. Graves; that a portion of the 375 acres consisted of a detached parcel of land, containing 56½ acres, as shown by a survey and plat thereof made by J. H. Biscoe on March 4, 1904, exhibited with the bill and marked Exhibit "B"; and that the complainants' title to said land is uncontrovertible, and they and those under whom complainants claim have had and held open, notorious, and adverse possession of said land since 1873, the boundaries of which are well known to a great number of persons, including the defendants. The bill further alleges that most of the said tract of land is open and in cultivation; that the 56½ acres (by survey), charged on the land books of the county of Spotsylvania as containing 55 acres, is situated a short distance from the residue of the 375 acres, and upon this detached portion there is a very fine growth of timber, which has been kept for the maintenance and keeping up of the buildings and fences, there being very little other timber on the place suitable for such purposes. It is further alleged that a few months prior to the filing of the bill one John M. Holladay, county surveyor of Spotsylvania county, as complainants were informed, not having apprised them of his purpose to do so, undertook to survey and lay off a part of said tract of land (the 56½ acres), described in the plat and survey marked Exhibit "B" (the plat, etc., made by Biscoe above mentioned), for Lucian Comfort and Samuel Woolfolk (defendants); and that complainants were further informed

by the said Comfort and Woolfolk that they, by reason of the said *ex parte* survey, claim such part of the said tract of land as the said Holladay surveyed for them. It is further alleged that complainant did not know where said Holladay undertook to run his lines on the 56½ acre tract, but, to their surprise, they, on the day before the filing of their bill (July 30, 1906), learned that said Lucian Comfort and Samuel Woolfolk had a large force of hands upon the said tract of land, felling, manufacturing, and hauling off much of the valuable timber thereon, and refused to desist; that complainants claimed and believed that the said Comfort and Woolfolk, well knowing that they were not upon their own land, or within the boundaries contained in their title deeds, but relying alone upon the *ex parte* and doubtful accuracy of such survey as the said Holladay had made for them, had undertaken to enter upon the said lands of the complainants, where they or their servants were then engaged in cutting down and manufacturing into cross-ties the young growth of timber thereon, thereby inflicting irreparable injury to the property of complainants; and that the said Comfort and Woolfolk were both of doubtful solvency, and, unless they were restrained from their unwarranted, assumptive, illegal, and damaging action, great and irreparable injury would be done unto complainants, as the said Comfort and Woolfolk claimed the right to cut timber from some fifteen acres of said land, and asserted their right and purpose to do so. The prayer of the bill is for an injunction, which was awarded, restraining the defendants, etc., from further cutting, manufacturing, or hauling off the timber cut on any part of the 56½ acres of land, described in the said plat, Exhibit "B," until the further order of the court, and for general relief.

To this bill the defendants filed their joint demurrer and answer, which demurrer was overruled, and, upon a hearing of the cause upon its merits, on the bill and the exhibits therewith, the answer thereto and the exhibits therewith, and depositions of numerous witnesses examined for both complainants and defendants, the circuit court adjudicated and fixed the line dividing the lands of the complainants from those of the defendants, and perpetuated the temporary injunction theretofore awarded in the cause, specifying that the defendants, etc., are perpetually enjoined,

restrained, and forbidden to any further interfere with or trespass upon the lands of the complainants westwardly of the line defined in the decree; and further adjudged that complainants recover of the defendants their costs, etc. From that decree the defendants obtained this appeal.

The overruling of their demurrer to the bill constitutes appellants' first assignment of error.

In short, the contentions of appellants are (1) that appellees' bill fails to show any title to the land in question in the appellees; (2) that, if they claim through adverse possession, no facts are stated showing what dominion they have had over the land—to-wit, the fifteen acres; (3) that the bill fails to show a fair *prima facie* case in support of the appellees' title; and (4) that appellees should have not only shown a *prima facie* title to the land, but should have set out the facts relied on to show that without equitable interference they would suffer irreparable injury, or that their remedy at law was not adequate and complete; and that, as the bill of appellees does not measure up to these requirements, the demurrer thereto should have been sustained.

We are unable to see the force of either of these contentions as applied to the bill in this case. It is true that where one claims under a paper title he should generally exhibit his title papers or copies thereof, or such of them at least as will make out a *prima facie* case of title; but where the bill, as in this case, alleges not only a paper title, and exhibits title papers evidencing the same, but alleges adverse possession of the land, and recites facts showing that the acts of ownership done thereon constitute adverse possession for the statutory period necessary to ripen his possession into a complete title, the general rule obtaining where the claim to the land rests upon a paper title does not apply.

The bill here recites that appellees acquired their title through the will of B. F. Graves, deceased, probated in 1885—E. M. Graves a life estate in the land and Daisy E. Griggs a one-half interest therein in remainder and in fee, reciting the will book in which the said will was recorded in the clerk's office of the county in which the land lies, naming the page where the will was so recorded, and with the bill is exhibited the deed by which W. W. Graves, who acquired the other one-half interest

in the land under his said father's will, conveyed the same to his mother, the said E. M. Graves. Their bill, as we have seen, not only alleges title to the land, and the sources from which it was derived, but sets out facts to show that the destruction of the timber on the 56½ acres involved not only the loss of the value of the timber itself, but great deterioration in the value of the cleared tract owned in connection with the tract of 56½ acres by appellees, for the reason that they were dependent upon the timber on the last-named tract for the maintenance and keeping up of the buildings and fences on the balance of the whole tract, the purposes for which the said timber had been kept, there being but little other timber on appellees' lands for such purposes, and they, therefore, characterized in their bill the injuries being done to the timber on the 56½ acre tract, and others threatened by appellants, as injuries to the inheritance, which could not be adequately compensated for in damages, and allege, moreover, that those committing these injuries and threatening others are both of doubtful solvency. The timber on the 56½ acres having been kept for the purposes stated, it is necessarily implied that the chief value of the land is in its timber—at least its chief value to the appellees as owners of the farm held in connection with the 56½ acres by B. F. Graves and his successors in title, the appellees.

The decision of this court in *Bledsoe* v. *Robinett*, 105 Va. 723, 54 S. E. 861, so much relied on for appellants, does not sustain their contentions. In that case the complainant did not exhibit with either his original or amended bill any of the title papers under which he claimed, nor did he allege any fact going to show that he ever had possession of the land; nor did the allegations of either bill show that the timber on the land constituted its chief value, or that it was essential to the enjoyment of the land, or how its removal would injure the inheritance.

As we have seen, the case made by appellees in this cause is very different from that made in the cause just referred to—*i. e.*, what was lacking in the bills in the former cause is made to appear in the bill in this cause.

Speaking of the necessity of alleging and proving that a complainant could not obtain adequate damages at law, the opinion

by Riely, J., in *Rakes* v. *Austin,* 2 Va. Dec. at p. 159, 22 S. E. at p. 499, says: "This is not necessary to entitle him to relief in equity, but whenever the substantive value of the estate in the character in which it is enjoyed is imperiled, that is sufficient to invoke the jurisdiction of a court of equity." *Morrison* v. *American Asso., Inc.,* 110 Va. 91, 65 S. E. 469.

In the last cited case, the opinion by Harrison, J., says, "The prevailing view and practice of the present day may be thus stated: 'When the bill states facts which show that a threatened trespass, if not prevented, will result in irreparable damage, or is in character and tendency destructive to the inheritance, or that which gives it its chief value, an injunction will be granted, notwithstanding a dispute, or even a pending litigation as to title.' " In that case it was sought to protect iron ore from repeated trespass committed and threatened, while here it is timber that had been held and used as a source of supply for building and fencing needed on a farm of 375 acres, and the destruction or serious impairment of which would work a detriment to the owners of the farm, for which damages at law would not compensate, since this timber, on only 56½ acres of a farm of 375 acres, is indispensable to the farm, and constitutes the chief if not practically the only value of the 56½ acres. At all events, it is shown in this bill to be essential to the enjoyment of the land. *Rakes* v. *Austin, supra; Bledsoe* v. *Robinett, supra; Miller* v. *Wills,* 95 Va. 337; 28 S. E. 337; *Collins* v. *Sutton,* 94 Va. 127, 26 S. E. 415; *Callaway* v. *Webster,* 98 Va. 791, 37 S. E. 276; *Camp* v. *Dixon,* 112 Ga. 872, 38 S. E. 71, 52 L. R. A. 755.

In the last named case it was held that the cutting and removal of timber from forest lands, which had been acquired for sawmilling purposes, is a destructive trespass, and one liable in its nature to cause irreparable damages to the owners of the timber, while in the case at bar the trespass committed and threatened consists in the cutting and removal of timber which has been kept for the maintenance of fences and buildings upon the adjacent farm, of which this timber was an essential part.

The bill of the appellees measures fully up to the requirements of a bill seeking an injunction to restrain a trespass, as prescribed

in the authorities cited. Therefore the demurrer thereto was properly overruled.

It is argued, however, that though the court had jurisdiction to award the injunction restraining the trespass charged in the bill, it erred in adjudicating the title to the land in question to be in appellees—first, because the jurisdiction of the court extends only to the preservation of the property *in statu quo* pending the trial of the title at law; and, second, that where the plaintiff shows a fair *prima facie* case in favor of his title, and is in actual possession of the subject of controversy, the decree should be that the defendant be enjoined until he brings suit at law and has the issue determined. In other words, the argument is that the court in this case could only enjoin the trespass, and delay the administration of final justice until such time as might suit the convenience of appellants to institute an action at law to settle the title to the land in controversy.

It is very true that the opinion of this court in *Callaway* v. *Webster, supra,* says: "It is well settled that an applicant in possession of land, with a clear title or a *prima facie* title, is entitled to an injunction against a trespasser threatening irreparable injury or often repeated trespass, but if it turns out from the evidence that the right of the applicant is in doubt, and the title and boundary of the lands are really in issue, such controversy cannot be settled in equity, though the property, in an urgent case, may be protected by the injunction until the question of right can be settled by a trial at law." Citing *Manchester Cotton Mills* v. *Manchester,* 25 Gratt. (66 Va.) 825.

That, however, is not the case we now have under consideration. In *Callaway* v. *Webster, supra,* it was made to appear at the hearing of the cause, upon the pleadings and proof offered, that not only were the allegations of the bill upon which the court took jurisdiction for the purpose of injunction false, but that the real object of the bill was to settle, in a court of equity, a controverted line or boundary, while the bill upon its face admitted the solvency of the defendant. In other words, the jurisdiction of the court of equity was invoked for the sole purpose of settling a controverted boundary of land. In this case, the proof offered at the hearing was conclusive that the trespasses committed were irreparable,

and that a continuance of them, as threatened, would be destructive of the inheritance, or that which gives it its chief value, and that the guilty parties (appellants) were both totally insolvent.

A question of title in such a case does not oust the jurisdiction of a court of equity; "and where a court of equity has properly acquired jurisdiction, it will, in order to prevent a multiplicity of suits, go on to do complete justice, though in doing so it has to try title, or settle boundaries, and administer remedies which rightly pertain to courts of law." *Miller* v. *Wills*, 95 Va. 337, 28 S. E. 337; and cases there cited.

In *Coons* v. *Coons*, 95 Va. 441, 28 S. E. 887, 64 Am. St. Rep. 804, the opinion by Keith, P., says: "Every party in interest is before the court upon a bill to set aside an award upon grounds which unquestionably give a court of equity jurisdiction. This jurisdiction having once attached for the purpose of injunction, the court may decide the whole controversy, and render a final decree, though all the issues are legal in their nature, capable of being tried by a court of law and the legal remedies therefor adequate. *Jesus College* v. *Bloom*, 3 Atkyns 262; *Armistead* v. *Gilchrist*, 2 John Chy. (N. Y.) 431; *People* v. *Chicago*, 53 Ill. 424; *Miller* v. *Wills, ante*, where the question was conclusively discussed by Judge Riely; 1 Pom. Eq. Jur., sec. 236." See also *Morrison* v. *American Asso., supra; Camp* v. *Dixon, supra; Dunn* v. *Stowers*, 104 Va. 290, 51 S. E. 370.

In the case of *Camp* v. *Dixon, supra*, the opinion collates, examines, and criticises a large number of authorities, showing the gradual extension of the powers of courts of equity in restraining acts injurious to the "inheritance," or freehold, laying stress upon the continuing character of the injury complained of.

In *DeVeney* v. *Gallagher*, cited in *Miller* v. *Wills, supra*, it was held that "courts of equity have jurisdiction, in cases of confusion of boundaries, to establish lines; and although they never entertain a simple suit to fix boundaries between individuals, where courts of law have jurisdiction, yet when the question is connected with matters that require the interference of equity, as where a defendant has threatened and has served a formal written notice that he intends to remove ten inches of the end wall of complainant's dwelling, which defendant alleges is upon

his land, a court of equity will, to prevent multiplicity of suits, entertain jurisdiction, and settle the boundary in order to determine whether the complainant is entitled to a continuance of its protection by injunction." 1 Pom. Eq. (3d ed.), sec. 181; 1 Story's Eq., sec. 609–'21.

*Freer v. Davis,* 52 W. Va. 1, 43 S. E. 164, 94 Am. St. Rep. 895, 59 L. R. A. 556, is very much relied on for appellants, but with respect to that case it is only necessary to say that not only was the opinion by a divided court, but whatever force was to be attached to it as an authority in this case has been greatly impaired, if not wholly dissipated, by the more recent decision of the same court in the case of *LeComte* v. *Carson,* 56 W. Va. 336, 49 S. E. 239, where the unanimous opinion of the court says: "Counsel for the appellants contest the jurisdiction of equity to entertain the case, because it is only a suit involving adverse titles or boundary, of which equity will not take jurisdiction, on principles stated in *Freer* v. *Davis,* 52 W. Va. 1 [*supra*]. * * * The ready answer to this objection is found in that and many other cases—that the rule that equity will not hold a case to try adverse titles to land is that it applies only 'when the plaintiff has no equity against the party claiming adversely to him.' When there is another ground for jurisdiction, independent of a trial of the hostile titles—one which only gives jurisdiction— equity takes it and tries the whole case."

The bill in *Freer* v. *Davis* stated no facts showing immediate need of an injunction to protect the property in dispute, pending the litigation of the legal title; while in *LeCompte* v. *Carson* the facts showed that an injunction was necessary to preserve the substance of the estate pending a final adjudication of the rights of all parties, and not only was the injunction granted, but the rights of all parties settled in the one proceeding.

In the case at bar there is not a bare allegation that appellees (plaintiffs below) were owners of the land in question, as was the case of *Bledsoe* v. *Robinett, supra,* but the derivation of their title is stated clearly and concisely, as is also the degree of title which they claim. Moreover, it is alleged that they (appellees) have been for over thirty years in possession of the land in question, and have used it for the production of timber for keeping

up the fences and buildings on the cleared portion of the farm, and that appellants (defendants below) well knew the location of the boundaries of the land as so used by the appellants. This is not a conclusion of law, as argued for appellants, but a statement of facts from which possession in the appellees is necessarily to be inferred. On the other hand, the land of which appellants were possessed when this controversy arose consisted of what was known as the Peake tract, said to contain thirty acres, more or less, lying adjoining the western boundary of appellees' land; but this land was returned delinquent for taxes assessed against John Gibson, who had theretofore obtained a deed therefor from the Peake heirs, dated November 23, 1889, and at a sale of the land to satisfy the lien for· said delinquent taxes, on December 15, 1898, one J. P. Turnley became the purchaser, but assigned the purchase to Thomas Gibson, and after a survey had been made of the land, as required by statute, the clerk of the court conveyed the land to said Thomas Gibson, describing it as follows: "Lying in Spotsylvania county, adjoining the lands of Oak Grove Farm and others, sold as thirty acres, but on survey of county surveyor, attached to the deed, contained sixteen and one-half acres only." Subsequently, August 3, 1903, appellants here obtained a deed from Thomas Gibson *et als.*, conveying to them the Peake tract according to the conveyance of the tax title to Thomas Gibson, and on the 21st of May, 1906, they obtained a quit claim deed to the "Peakes" land, describing it as having been "deeded to first party by G. B. Dillard, Charles R. Peake, Sallie Peake, James J. Peake, and others, by deed dated November 23, 1889, and recorded in deed book "A. D.," p. 272, of the land records of Spotsylvania county, and as surveyed by John M. Holladay, the county surveyor, whose plat is hereby made a part of this deed."

There are other deeds exhibited with appellants' answer, showing the chain of title under which they claim the Peake land, but with respect to them we deem it only necessary to say that none of them, nor the aforesaid quit-claim deed, fix the dividing line between the Peake tract and appellees' land as it is now claimed by the appellants to be located; and, what is more, neither appellants nor those under whom they claim ever asserted claim

to or exercised any acts of ownership upon the land here in question until after the Holladay survey was made, when appellants went upon the fifteen acres cut off from the 56½ acres of timbered land claimed and occupied by appellees, and began a wholesale destruction of the timber standing thereon.

With respect to the *ex parte* Holladay survey, it is only necessary to say that, when considered in connection with his own deposition in this case and the other facts proven, it is mainly, if not altogether, a piece of guess-work, the result of which is in conflict with physical facts appearing on the ground and the facts proven in the record beyond question, which was doubtless the view taken of it by the circuit court. Confessedly, Holladay did not follow the courses given in the older deeds forming a part of the chain of title to the land of the appellants, formerly the "Peake" land, nor did he regard the marked corners in the line dividing the land of appellants and that of appellees, shown upon the plat made by Biscoe when both appellants were present, and one of them pointed out these corners.

"The opinion of a surveyor, unsupported by other evidence, as to the identity of a tract of land, unless he also states some fact or facts by which the court can determine the location of the land, is clearly insufficient to enable the court to locate the same." *Randolph* v. *Adams*, 2 W. Va. 519.

A pregnant physical fact proven is that, when the trespass which gives rise to this litigation was begun, the land of appellants had but a few trees upon it, the land having been cleared up to the line between their land and the timbered tract of appellees, while on appellees' timber tract adjoining there was a splendid growth of white oak timber. Never before the Holladay survey did appellants claim the right to go beyond that line. On the contrary, they knew of and acquiesced in the location of the line between them and appellants by two surveys, one of them made by J. H. Biscoe, a competent surveyor, about four or five years prior to the giving of his deposition in this cause in April, 1907. Biscoe, as a totally disinterested witness, states that when he made his survey locating the line between the lands of appellants and appellees, both of the appellants were present, and that appellant Lucian Comfort and Ira Luck pointed out the corners

for him. He further states that when he had located the line (as claimed by appellees and as formerly surveyed and platted by county surveyor A. W. Massey) both Comfort and Woolfolk were perfectly satisfied. Ira Luck testifies also that appellant, Lucian Comfort, pointed out the corners when Biscoe was engaged in locating the line in question, and he further testifies that from his own knowledge this line was known of and acquiesced in by Gibson and the Peake heirs, appellants' predecessors in title. It is proven that B. F. Graves in his lifetime recognized the line as run by Massey and Biscoe as his boundary, and Miss Susan Peake, one of the Peake heirs, an elderly lady, totally disinterested, and familiar from her childhood with the landmarks forming the calls in the line between the Peake lands and the Graves land, went upon the land unassisted and located the calls in that line as they are made to appear on the Biscoe plat, and testifies to that effect in this case.

Lee J. Graves, a son of appellee E. M. Graves, testifies as to the same facts, and further testifies as to the uses made of the timber on the 56½ acre tract owned by appellees in connection with their farm; that this timber on the 56½ acres was essential to the enjoyment of the farm, "as it contained its principal timber supply, and without this timber, in a community where no adjoining timber could be purchased, the loss would be greatly enhanced"; that the loss of the timber on that portion of the land cut off by the Holladay survey "would entail a greater loss on the use and enjoyment of the farm than the commercial value of the timber on the tract"; and that he (witness) "would consider the loss of this timber on the parcel of land cut off by Holladay and in dispute of greater value than Lucian Comfort's and Sam Woolfolk's property is worth."

We have not undertaken to review at length the mass of evidence introduced in the case, as much of it is of no value, and when directed to sustain the contention of appellants it is either discredited or successfully contradicted by the proof as to the facts we have stated.

With respect to acts of ownership done on the land in question by appellants, the vague and inconsistent evidence of their witnesses at best only establishes trespasses on the land in question,

of which appellees were never cognizant.   We agree with counsel
for appellees in saying that, taking as true every fact testified to
by the witnesses for appellants, only a vague uncertainty is created
as to the true location of the boundary in dispute.   On the other
hand, the witnesses for appellees testify, not to theories or indefi-
nite invasions of the territory in dispute, but to the fact that
appellees and those under whom they claim have had and held
open, notorious, and adverse possession of the land for more than
thirty years, doing such acts thereon continuously, going to show
a claim of ownership, as the nature of the land and the uses for
which the timber thereon had been kept would permit.   These
witnesses further prove conclusively that all parties interested,
including appellants, had knowledge all along of the marks on
the ground in the disputed line, which, as has been repeatedly
held by this court, are entitled to preference over courses and
distances. *Reusens* v. *Lawson*, 91 Va. 226, 21 S. E. 347; *Dogan*
v. *Seekright*, 4 Hen. & Mun. (12 Va.) 125; *Gwynn* v. *Schwartz*,
37 W. Va. 487, 9 S. E. 880.

Finally, it is contended for appellants that the decree com-
plained of goes beyond the scope of the bill and the relief prayed
for, and, therefore, appellees were only entitled to a temporary
injunction, preserving the property until the issue could be tried
at law.   As supporting this contention, *Hurt* v. *Jones*, 75 Va.
351, is cited.

In that case the bill set forth ownership of an interest in land
and asked for partition.   Under the prayer for general relief,
when it was found that the complainant owned no interest in
the land, a decree was entered against the defendant in the lower
court for the purchase price of complainant's interest, which
decree was, as a matter of course, reversed by this court, as the
allegations of the bill made no reference to the purchase by the
defendant, but set up title in the complainant.   Not only was
the decree not supported by the allegations of the bill, but it was
in direct conflict with the complainant's claim that she owned
the interest in the land.   The opinion by Burks, J., says: " 'The
usual course is for the plaintiff in this part of his bill to make a
special prayer for the particular relief to which he thinks himself
entitled, and then to conclude with a prayer for general relief

at the discretion of the court. The latter can never be properly and safely omitted, because, if the plaintiff shall mistake the relief to which he is entitled in his special prayer, the court may yet afford him the relief to which he has a right under the prayer for general relief, provided it is such relief as is agreeable to the case made by the bill.' Story's Eq. Plead., sec. 40.

"Again, 'but, even when a prayer of general relief is sufficient, the special relief prayed at the bar must essentially depend upon the proper frame and structure of the bill; for the court will grant such relief only as the case stated will justify, and will not ordinarily be so indulgent as to permit a bill framed for one purpose to answer another, especially if the defendant may be surprised or prejudiced thereby.' And the illustration he gives is just the converse of the case in hand. 'Thus,' says he, 'if a bill is brought for an annuity, or rent charge, of ten pounds *per annum*, left under a will, and the counsel for the plaintiff pray at the bar that they may drop the demand of the annuity or rent charge, and insist upon the land itself, out of which the annuity or rent charge issues, the court will not grant it, for it is not agreeable to the case made by the bill.' *Id.*, sec. 42.

"And the relief which may be supplied from the general prayer must not only be consistent with the case made by the bill, but also with the relief specially prayed. 1 Dan. Ch. Prac. (4 Amer. Ed.) 378–'79, and notes. Under the general prayer the plaintiff is entitled to any relief which the material facts and circumstances put in issue by the bill will sustain; but it must be consistent with the case made, and if inconsistent with it, and with the specific relief prayed, will always be refused. Parker, J., in *James* v. *Bird's Adm'r*, 8 Leigh (35 Va.) 510–'13, 31 Am. Dec. 668.

"In *Hiern* v. *Mill*, 13 Ves. R. 114, (cited in 1 Dan. Ch. Prac. 380) Lord Eldon said: 'The rule is that if the bill contains charges putting facts in issue that are material, the plaintiff is entitled to the relief which those facts will sustain, under the general prayer; but he cannot desert the specific relief prayed, and under the general prayer ask specific relief of another description, unless the facts and circumstances charged by the bill will, consistently with the rules of the court, maintain that relief.'"

We see nothing in what has just been quoted that renders

even doubtful the propriety of the relief afforded by the decree complained of in this case. On the contrary, as applied to the allegations of the bill and the proof sustaining them, it sustains the ruling of the circuit court.

"Where the plaintiff prays for special and also for general relief, if the special prayer is such that no relief can be granted under it, the court may, under the prayer for general relief, grant any proper relief consistent with the case made by the bill." 3 Enc. Pl. and Pr., p. 348; see also pp. 349-'50.

In this case the allegations of the bill, as we have seen, are that the complainants have title to the land, showing how derived; that they have been in the possession thereof since 1873, using the timber on the 56½ acres to keep up fences and buildings on the farm; that the timber constitutes the chief value of the land in controversy, and its destruction would result in irreparable injury; and that the defendants are probably insolvent, so that a judgment at law would be of no avail; the prayer being for an injunction restraining and enjoining the defendants until they establish their title, and for general relief. The defendants (appellants) set up their own title in their answer, and made a fruitless effort to support it by evidence. They nowhere denied the trespasses committed and threatened by them, as charged in the bill, nor did they attempt to meet the charge of insolvency, fully sustained by the proof of appellees. On behalf of the appellees, every allegation of their bill is sustained by the proof they adduced, and under their prayer for general relief they were entitled to the relief afforded by the final decree of the circuit court, and that relief is not inconsistent with either the special prayer or in conflict with the facts charged in the bill. Any other decree than that which was entered would have fallen short of the complete relief to which appellees, under the facts and circumstances alleged in their bill and proved in the evidence, were entitled. *Miller* v. *Wills, supra,* and the other pertinent authorities cited above.

Upon the whole case, we are of opinion that there is no error in the decree complained of, and, therefore, it is affirmed.

UPON A REHEARING JANUARY 25, 1912.

BY THE COURT:

A decree was rendered in this cause on the 12th day of January, 1911, which, upon a petition to rehear, was set aside.

As said in the opinion disposing of the case on the former hearing, "the appellants set up their own title to the land in question in their answer, and made a fruitless effort to support it by evidence. They nowhere denied the trespasses committed and threatened by them, as charged in the bill, nor did they attempt to meet the charge of insolvency, fully sustained by the proof of appellees."

Upon a careful consideration of the case upon the rehearing, the conclusion is irresistible that appellants not only failed to make out a *prima facie* title to the land upon which the trespasses were committed and threatened, but that their assertion of title is not *bona fide;* therefore they are not entitled, as has been so earnestly pressed in argument, to a trial of the issue by jury. *Moorman & Hurt* v. *City of Lynchburg*, 73 S. E. 987.

For the reasons given and the authorities cited in this and in the opinion of this court filed at the former hearing of the case, the decree entered at that time is approved, and will be adhered to.

*Affirmed.*