# Richmond

## W. C. Owens v. A. J. Owens.

Record No. 4292.

March 7, 1955.

Present, All the Justices.

The opinion states the case.

*A. T. Griffith*, for the appellant.

*Raymond J. Boyd*, for the appellee.

SMITH, J., delivered the opinion of the court.

The plaintiff, W. C. Owens, filed a bill in chancery against his brother, A. J. Owens, defendant, alleging that when his father, H. S. Owens, died intestate on July 20, 1950, he became the owner of a one half interest in his father's real property subject to the dower interest of his mother, and a one third interest in the personal property of his father, whose estate was worth more than $100,000. The bill further alleged that plaintiff was indebted in the sum of $5,000, which constituted a lien on his share of the real estate, and that to pay this indebtedness he conveyed his interest in the estate to the defendant on July 31, 1950; that while the deed was absolute on its face, it was not intended as such by the parties, but was intended to secure payment of $5,000, an amount defendant had agreed to obligate him-

self as surety for the plaintiff; that the $5,000 had been fully paid and satisfied out of plaintiff's inheritance, and that he had requested and demanded of the defendant an accounting and settlement of his interest in the estate, but that defendant had refused and declined even though the value of plaintiff's interest in the estate was in excess of $30,000.

The bill prayed that "an account be taken, and inquiry directed as to the state of the accounts between your complainant and the said A. J. Owens; that if anything be found to be due and payable to the said A. J. Owens upon said accounting, your complainant offers to pay the same; that the defendant, A. J. Owens be compelled to reconvey the said lands and interest in lands to your complainant by sufficient and proper deed of conveyance in fee, and to account to your complainant for the proceeds of the personal properties and effects so received from your complainant; and that your complainant have all such other, further and general relief in the premises as the nature of his case may require, or to equity shall seem meet."

In his answer the defendant denied the allegations contained in the bill and averred that the deed was executed by the plaintiff for the purpose of transferring his entire interest in the estate for a cash consideration of $5,000, which he paid plaintiff prior to the execution and delivery of the deed.

Upon consideration of the evidence, all of which was taken by depositions, the trial court dismissed the bill and entered final judgment for the defendant, to which judgment we awarded plaintiff this appeal.

In his deposition, plaintiff testified that the $5,000 paid by defendant in satisfaction of plaintiff's debts was only a partial payment for the property and that defendant promised to settle for the remainder of his interest in the estate as soon as final settlement was made by defendant as administrator. Plaintiff adheres to this position and contends that the consideration of $5,000 received by him, was "so grossly inadequate and unconscionable as to warrant the

court in seizing upon the confidential relationship of the parties, the oppression of the vendor, the fraud and deceit in the failure of the vendee to disclose the extent and the value of the properties and effects being received by him, and the conditions existing making it certain that the parties did not deal on terms of equality."

Had the defendant objected in the trial court that plaintiff's evidence did not conform to the allegations of the bill he could have compelled the plaintiff to allege with more exactness the grounds of his claim. This the defendant did not do, but elected to meet the plaintiff on the evidence introduced; and he stated in his brief: "The sole question at issue is whether the sale by the appellant to the appellee was induced by fraud, either actual or constructive." Therefore he can not now complain if the evidence in this equitable proceeding shows that the relief prayed should be granted. See Rule 1:8.

When H. S. Owens died intestate on July 20, 1950, he was survived by his wife, Laura Owens, then 75 years old, and two sons, W. C. Owens, plaintiff, then 53 years old, and A. J. Owens, defendant, then 47 years old. At the time of his death he owned two farms in Russell county, one of which was known as the Home Farm containing 107 acres and the other known as the Mountain Farm containing 119 acres.

Three land owners residing in the community testified that the Home Farm was worth $200, $300 and $400 per acre; and the two who were familiar with the Mountain Farm testified that it was worth from $50 to $60 per acre. Unlike most of the evidence in the case, this testimony was not only uncontradicted but counsel for the defendant made no effort to contradict it, merely objecting that such evidence of value was not "material to any issue in this cause, is wholly irrelevant, immaterial and inadmissible."

On the basis of this uncontradicted evidence we are warranted in accepting $300 per acre as the approximate value of the Home Farm and $55 per acre on the Mountain Farm,

or \$38,645 as the total value of the real property. Thus the plaintiff's one half interest in the real property was worth \$19,322.50, subject to the dower interest of his 75 year old mother.

The total value of the personal property in the hands of the defendant-administrator was approximately \$22,000 as shown by his settlement of accounts and by the evidence, which identified certain items not included in the inventory of the estate. Hence plaintiff's one third interest in the personal property amounted to approximately \$7,333.33, and his interest in his father's estate totaled approximately \$26,-655.83, subject only to the dower interest of his mother.

The record discloses that shortly after his divorce from his first wife in 1938 or 1939, the plaintiff left the State and remained out of direct communication with his family in Virginia until his father's death in 1950. Before leaving Virginia he had become heavily indebted and shortly thereafter had been indicted for forging his father's name to certain negotiable instruments totaling \$1,200.

During the plaintiff's absence from the State the defendant lived either at the home of his parents or close by with his wife, from whom he was divorced some time prior to the death of his father. He worked with his father and for about four years prior to his father's death exercised exclusive control over his affairs.

On July 25th or 26th, 1950, plaintiff received word of his father's death and before daybreak on July 28, 1950 he arrived at the home of his parents. The defendant testified concerning what occurred *immediately* upon plaintiff's arrival: "Well, sir, he came in and talked to us a while, and he said he was given out and wanted some rest and went up in my room and laid down. He wanted to know if we reckoned we could fix up these indictments and this indebtedness of his and get a clean slate of it. * * * He asked me if I would come to Lebanon and check into it and see what indebtedness was against him and to see the Commonwealth's Attorney, and also the representative of the Bank, Mr. Joe

Duff, to see about paying this off, and if they would withdraw the indictments and make him free."

As a result of this conversation defendant went to Lebanon that day and upon his return reported to the plaintiff that it would take approximately $3,000 to satisfy the outstanding claims against him and that if the allegedly forged notes were paid, the Commonwealth's Attorney was willing upon payment of costs to move that a *nolle prosequi* be entered. Plaintiff then signed a note for $3,000, endorsed by defendant, which was negotiated at the bank and the proceeds applied to his debts. Thereafter it developed that approximately $2,000 more would be required to pay in full all obligations, including interest and costs. It was after this fact became known that the plaintiff, on July 31, 1950, signed and delivered a deed absolute on its face conveying to the defendant for a consideration of $5,000, all of his right, title and interest in his father's property. Upon execution of the deed, $2,000 in cash was delivered to an attorney for creditors of plaintiff and the defendant assumed the earlier note of $3,000. All but about $300 of the $2,000 was used to pay the balance of the plaintiff's obligations. The indictments against him were not dismissed prior to the execution of the deed but the Commonwealth's Attorney agreed to move that a *nolle prosequi* be entered upon payment of costs. They were not so disposed of until the following September 15th.

By the time the plaintiff arrived in Virginia on July 28, 1950, his creditors had notified the defendant, who had been appointed administrator of his father's estate on July 26, 1950, that they were contemplating the institution of suit to enforce their claims against plaintiff's share of the estate. An attorney testified that his clients were· safe because plaintiff "owned the property and we had already attached it and there was no doubt about our debts, so far as they were concerned."

Plaintiff having been granted only five days leave from his work in Indiana, left for his home shortly after the deed

was executed. The parties did not again discuss the subject until after the defendant made his final settlement of the estate, when plaintiff asked defendant to see a copy of the appraisal of the estate. The evidence as to what occurred at that time is in sharp conflict, but it is admitted that plaintiff asked defendant to sign a demand note payable to him in the amount of $14,730, the amount which plaintiff said he and defendant had agreed was the balance due for his share of the estate. The defendant refused to sign the note because, as he testified, the $5,000 was in full and complete payment of the entire interest of the plaintiff in the estate. Thereafter the plaintiff instituted this suit.

The circumstances under which a person conveys property for a small fraction of its value should be carefully examined in all cases, and especially so when, as here, there is a fiduciary relationship between the parties. It is well settled, as recently stated, that: "The personal representative of a decedent holds a position of trust and confidence. He is 'deemed a trustee, exercising a continuing trust as to legatees and distributees of his decedent's estate.'" *Virginia Trust Co.* v. *Evans*, 193 Va. 425, 433, 69 S. E. (2d) 409.

The principles to be applied where the trustee purchases the trust property from the beneficiary are settled by the overwhelming weight of authority. These principles are stated in 3 Pomeroy on Equity Jurisprudence, § 958d, p. 814 (5th ed. 1941), thus:

"A purchase by a trustee from his *cestui que trust*, even for a fair price and without any undue advantage, or any other transaction between them by which the trustee obtains a benefit, is generally voidable, and will be set aside on behalf of the beneficiary; it is at least *prima facie* voidable upon the mere facts thus stated.

"There is, however, no imperative rule of equity that a transaction between the parties is necessarily, in every instance, voidable. It is possible for the trustee to overcome the presumption of invalidity. If the trustee can show, by unimpeachable and convincing evidence, that the beneficiary,

being *sui juris*, had full information and complete under-standing of all the facts concerning the property and the transaction itself, and the person with whom he was dealing, and gave a perfectly free consent, and that the price paid was fair and adequate, and that he made to the beneficiary a perfectly honest and complete disclosure of all the knowl-edge or information concerning the property possessed by himself, or which he might, with reasonable diligence, have possessed, and that he has obtained no undue or inequitable advantage, and especially if it appears that the beneficiary acted in the transaction upon the independent information and advice of some intelligent third person, competent to give such advice, then the transaction will be sustained by a court of equity." This language was quoted with approval and applied in *Branch* v. *Buckley*, 109 Va. 784, 789, 65 S. E. 652.

"* * *'Nothing in the law of fiduciary trusts is better settled than that the trustee shall not be allowed to advantage himself in dealings with the trust estate. He shall not be allowed to serve himself under the pretense of serving his *cestui que trust*. The most usual way in which evasions of this salutary rule are attempted is in purchases of the trust estate by or in the interest of the trustee. * * *.' " *Swineford* v. *Virginia Trust Co.*, 154 Va. 751, 759, 152 S. E. 350, 353, quoting from 26 R. C. L., at page 1325.

In *Rowland* v. *Kable*, 174 Va. 343, 368, 6 S. E. (2d) 633, Mr. Justice Spratley, speaking for the court, said: "In *Waddy* v. *Grimes*, 154 Va. 615, 647, 153 S. E. 807, 817, the majority rule is stated thus: 'There is a distinction to be made between transactions occurring directly between a trustee and his *cestui que trust*, and those transactions in which the trustee deals with himself in respect to the trust estate. The latter class of transactions are voidable by the *cestui que trust* at his election without giving any reason or alleging any fraud, or any advantage or inadequacy of price. But where the trustee deals directly with the *cestui que trust*, the transaction is not *ipso facto* voidable at the election of

the *cestui que trust;* but only *prima facie* presumed to be invalid, which presumption may be rebutted.' "

Courts cannot relieve one of the consequences of a contract merely because it was unwise. "They are not guardians in general to the people at large, but where inadequacy of price is such as to shock their conscience equity is alert to seize upon the slightest circumstance indicative of fraud, either actual or constructive." *Jackson* v. *Seymour,* 193 Va. 735, 741, 71 S. E. (2d) 181, 185, quoting from *Planters Nat. Bank* v. *Heflin Co.,* 166 Va. 166, 173-4, 184 S. E. 216, 219. See also 8 Michie's Jur., Executors and Administrators, § 86, p. 200; 16 Michie's Jur., Rescission, Cancellation and Reformation, § 14, p. 145; 33 C. J. S., Executors and Administrators, § 240, p. 1246; 37 C. J. S., Fraud, § 2(c)(2), p. 213.

For additional Virginia decisions in which the principles applicable to this case have been discussed or applied, see *Bresee* v. *Bradfield,* 99 Va. 331, 38 S. E. 196; *Bowles* v. *Bowles,* 141 Va. 35, 126 S. E. 49; *Broaddus* v. *Broaddus,* 144 Va. 727, 13,0 S. E. 794. See also, Lile's Notes on Equity Jurisprudence, p. 137; 21 Am. Jur., Executors and Administrators, § 632, pp. 736, 737; 3 Pomeroy on Equity Jurisprudence, § 956, p. 790 (5th ed. 1941).

The defendant contends that plaintiff made the initial offer to sell and suggested the price of $5,000, that he knew or had the opportunity of knowing the value of the estate, and that he sold with full knowledge of what he was doing. Plaintiff contends, on the other hand, that the deed was made absolute on its face to facilitate settling the estate and that it was understood that there would be an accounting after the estate was settled. Regardless of whether the plaintiff made the initial offer to sell his interest in the estate for $5,000 or whether there was an understanding that there would be an accounting after the estate was settled, the defendant was administrator of the estate and as such his relationship to the plaintiff was that of trustee to beneficiary. It is true that the real property of an intestate descends to his heirs and does not pass through the hands of an ad-

ministrator, but in view of the superior position held by the defendant under the circumstances of this case, he occupies a fiduciary relationship with respect both to the personalty and the realty. In any event the result is the same.

The transaction is *prima facie* presumed invalid, and in order to rebut the presumption, equity casts upon the defendant the burden of proving affirmatively that he made to the plaintiff an honest and complete disclosure of all the information concerning the property possessed by him and that the price paid was fair and adequate and that he obtained no undue or inequitable advantage.

Whatever may be the conflict in the evidence on other points, there is none as to the fact that A. J. Owens, while acting as administrator of his father's estate, received a conveyance of the entire interest of his brother, an heir and distributee, in both the personal property and the real estate owned by their father for a consideration which was less than the interest of his brother in the personal property alone. As stated above, the evidence clearly shows that the property obtained by defendant was worth more than five times what he paid for it. He admits in his brief that his father at the time of his death owned real property worth $30,000 and personal property worth $11,500. These figures are in no wise substantiated by the evidence, but even if they be accepted as true, the plaintiff's total interest in the estate would be $18,333.33, subject to the dower interest of his mother. The defendant's final settlement of the estate shows receipts amounting to $15,435.26 and his own testimony shows that $4,200 worth of cattle was not listed, in addition to several other omitted articles of personal property. It also appears that some of the values used in the appraisal are inaccurate, for instance, 2233 bales of hay which cost $349 to harvest were appraised at only $457.85.

Aside from the gross inadequacy of the consideration the evidence shows that the estate had been attached for the debts of the plaintiff at the time the deed was executed and it may be reasonably inferred that it was in the interest of

both the plaintiff and defendant to keep the estate from involvement in law suits, and therefore the contention of the plaintiff that the deed was made to facilitate settlement of the estate is more plausible than the contention of defendant. Furthermore, the defendant had managed his father's affairs, even signed his checks, for four years prior to his death and had full and complete knowledge of all his property, while the plaintiff had been out of the State for more than ten years. Yet, there is no evidence that the defendant ever made a full and complete disclosure of the value of the estate to the plaintiff, who upon his arrival was primarily interested in paying his debts and seeing "if they would withdraw the indictments and make him free," as stated by the defendant. For example, defendant testified that plaintiff knew that their father had some government bonds, "but I wouldn't say whether I told him the exact amount or not." He was further asked whether the plaintiff made any investigation of the livestock owned by his father and he replied, "Well, I told him. We went on the place and I told him. Of course, I don't know—the only thing he knew was what I told him, I guess, so far as I know." In addition, it is undisputed that the plaintiff did not go on the Mountain Farm where the cattle were during the three days plaintiff was in Russell county prior to the execution of the deed.

Although the defendant had full information of the value of the estate and that the plaintiff's share in the personal property alone was ample to satisfy the pressing obligations of plaintiff, he never disclosed this information to his brother; but instead, kept it to himself and took a deed to the whole inheritance, a transaction presumed invalid, and he has utterly failed to rebut this presumption by showing that he made a full disclosure of all the material facts in his possession; that the price paid was fair and adequate and that he obtained no undue or inequitable advantage of the plaintiff.

For the reasons stated the decree of the trial court is reversed, the deed from W. C. Owens to A. J. Owens set

aside and annulled, and the case remanded with directions that A. J. Owens be required to account for W. C. Owens' interest in the personal property of H. S. Owens' estate.

*Reversed and remanded.*

EGGLESTON, J., concurring.

HUDGINS, C.J., SPRATLEY and WHITTLE, JJ., dissenting.

EGGLESTON, J., concurring.

I concur in the holding of the majority opinion that the conveyance by W. C. Owens to A. J. Owens of the grantor's interest in his father's estate should be set aside on the ground of gross inadequacy of consideration amounting to constructive fraud.

It is uncontradicted that the grantee, A. J. Owens, while acting as administrator of his father's estate, received a conveyance of the entire interest of his brother, W. C. Owens, an heir and distributee, in both the personal property and real estate owned by their father, for the sum of $5,000. It appears from a fair reading of the evidence that the grantor's interest in the personal estate was worth about $6,000 and that his interest in the real estate was worth more than $10,000.

As both the majority and dissenting opinions point out, the bill of complaint alleged that the deed, absolute on its face, was intended as a mortgage to secure liabilities which the grantee had incurred on behalf of the grantor, and that upon the taking of depositions the plaintiff, the grantor, changed his position and attacked the validity of the deed on the additional ground of gross inadequacy in price and constructive fraud.

In his brief filed in this Court the appellee grantee says: "In his effort to attack the validity of the deed, appellant advanced two positions, viz: (1) that the deed was intended

as a mere encumbrance to secure the payment of certain indebtedness owing by him; and, (2) that the consideration paid by appellee was so grossly inadequate as to amount to a constructive fraud upon appellant." The appellee's brief then states that the first point "has been abandoned by the appellant because very little, if any, evidence was offered in support of such contention." The brief thus points up the only question presented on this appeal:

### "The Issue Involved

"The sole question at issue is whether the sale by the appellant to the appellee was induced by fraud, either actual or constructive."

There is no contention by appellee that the decree should be affirmed on the grounds raised in the dissenting opinion, namely, (1) that an avoidance of the conveyance because of constructive fraud was not within the scope of the pleadings and was not before the court; (2) that the appellant's case on appeal is different from that which he attempted to make out in the lower court.

As I read the record and briefs, both parties clearly understood the issue upon which the case had been heard and decided in the lower court and what issue was to be determined on appeal. It is my view that the majority opinion correctly decides the issue which was submitted to us.

Whittle, J., dissenting

I find no fault with the general equitable principles recited in the concluding portion of the majority opinion. My position is that these principles are entirely foreign to the case presented in the bill and answer, and, to a large degree are not applicable to the new case constructed by and considered for the first time in the opinion.

The case properly before us as disclosed by the pleadings and relevant proof is not difficult. W. C. Owens and A. J. Owens were the sons of H. S. Owens, deceased. These two

brothers and their mother, Laura Owens, the widow of the deceased, were his only heirs at law when he died intestate on July 20, 1950. On July 31, 1950, W. C. Owens conveyed to his brother, A. J. Owens, his entire right, title and interest in his father's estate.

On November 9, 1951, W. C. Owens filed a bill in the Circuit Court of Russell County specifically alleging "that the said mentioned deed of conveyance, although appearing to be absolute on its face, was not intended to be such by your complainant and the said A. J. Owens, but on the contrary thereof, it was expressly understood and agreed between your complainant and the said A. J. Owens that the said title to said properties and effects were to be held by the said A. J. Owens as a security for the * * * $5,000 which * * * A. J. Owens had agreed to obligate himself for as surety for your complainant. * * *"

Thus a parol trust was alleged in the bill.

Continuing, the bill stated that A. J. Owens had received ample funds from complainant's share of the estate with which to repay the $5,000 due him by complainant. The bill's prayer for specific relief was that, for the reasons assigned, "A. J. Owens be compelled to reconvey the said lands and interest in lands to your complainant by sufficient and proper deed of conveyance in fee", and to account for the personal property. The bill concluded with a prayer for general relief.

Thus A. J. Owens was informed only that W. C. Owens contended that the deed, although absolute on its face, was in truth and in fact, a trust executed for his (A. J. Owens') protection.

Prof. Lile, in his work on equity pleading (Lile's Equity Pleading and Practice (Meade), Third Ed., § 100, p. 61) outlines the purpose of the bill in equity as follows: "The purpose of the bill is two-fold: (1) To state the plaintiff's case for the information of the defendant in the preparation of his defense; and (2) for the information of the court in the trial of the cause, and to fix the issues. The defendant is

supposed to note the plaintiff's grievances *only from his statement of them in the bill,* and it is to *the precise case thus stated,* and to that case only, that the defendant can be required to answer; and to the case so made *the evidence must be confined;* and no relief will be granted that *does not substantially accord with the case as made in the bill.* Hence the importance of accurate knowledge, by counsel, of the facts of his case, and the law applicable thereto, before he undertakes to present his case in the form of the bill." (Italics those of the author) This statement is in accord with the general rule.

"* * * It is necessary, * * * for bills in equity to have such a degree of certainty that defendant may be *distinctly informed* of the nature of the claim made against him and of what he is called on to answer. * * *" (Italics supplied) 30 C. J. S., Equity, § 218, pp. 673, 674.

A. J. Owens, as demanded in the bill, filed his answer to the allegation made therein. He denied the allegation and specifically averred "that the said mentioned deed of conveyance was absolute on its face and was so intended to be such by your respondent and the said W. C. Owens, and was executed for the purpose of transferring legal title of the complainant in and to the said property to your respondent in fee simple; * * *." On the single issue thus joined, A. J. Owens called for strict proof.

The complainant, in an effort to carry the burden of his allegation, testified that he knew his interest in his father's estate amounted to "far in excess of $30,000", and that under no circumstances would he have sold his interest for $5,000; that he was in debt and that judgments had been lodged against him; that he arranged with respondent to stand surety for a sum sufficient to pay off this indebtedness; that his brother complied with the request, and that the deed was executed for the sole purpose of saving his brother harmless.

On cross-examination he was asked if he did not understand the deed before he signed it, to which he replied:

"A. I can't say that I did or I didn't. I won't say that I did. Mr. Duff read it to me.

"Q. You did understand it when he read it?

"A. I did. Mr. Duff read the deed and I won't state that I did or didn't.

"Q. But you did understand the meaning of the deed when it was read?

"A. I knew it was the deed.

"Q. There is nothing in this deed which provides that he is to reconvey any amount of property to you at all, is there?

"A. No, sir.

"Q. Did you explain to Mr. Duff your understanding with Mr. A. J. Owens?

"A. No, sir.

"Q. Why didn't you?

"A. There was no occasion to.

"Q. If you were only attempting to put a mortgage on your interest to secure the payment of some of your indebtedness, why didn't you explain to the attorney who prepared the deed that that was your intention?

"A. It wasn't any—the only thing we asked Mr. Duff to do was to make the deed. That is, we didn't explain to him our agreement or the agreement in which we had entered into. That wasn't brought into it at all with Mr. Duff. All we asked Mr. Duff to do was to write the deed.

"Q. You did tell Mr. Duff the consideration was $5,000.00 cash, did you not?

"A. I did."

This was the extent of complainant's relevant evidence on the issue joined.

To refute complainant's contention, the respondent introduced his mother who testified that she heard complainant tell the attorney that he wanted the deed prepared conveying his interest to his brother, and that after the deed had been recorded and they had returned home she asked com-

plainant if he was satisfied with the deal, to which he replied, "Yes, mother, I am satisfied. I am well satisfied."

Respondent also introduced J. E. Duff, the attorney, who testified that complainant had asked him to write the deed conveying his interest in his father's estate to his brother, telling him that he had sold the same for $5,000, and that he intended to pay his debts and get out of Virginia. Duff stated that W. C. Owens fully understood the deed before signing it and that it was an outright sale.

He further testified that he paid off the judgment debts which included the notes on which complainant had been indicted; that he secured from the Commonwealth's attorney a promise to *nolle pros* the indictments; that he questioned complainant as to his marital status and was told that he was unmarried, and the deed was prepared accordingly.

A. J. Owens testified that after his father's death his brother came home from Indiana; that he had been away from Virginia since 1940; that when he left Virginia there were several indictments pending against him charging that he had forged his father's name to notes aggregating $1200; that when he left Virginia he left his wife and two children in Russell County and later obtained a divorce; that he learned after the recordation of the deed that complainant had married his present wife in May, 1943; that immediately upon his return to Virginia complainant asked respondent what could be done about the indictments and judgments pending against him; that respondent consulted Mr. Duff at the request of complainant; that the attorney informed him that it would require at least $3,000 to clear the judgments; that on July 28, 1950, respondent endorsed complainant's note for $3,000 and negotiated it at the bank; that complainant delivered the proceeds of the note to Mr. Duff who applied it to complainant's indebtedness; and that Duff secured an agreement whereby the indictments would be *nolle prossed.*

Respondent further testified that after he had arranged for the payment of complainant's debts and had secured the

promise that the indictments would be *nolle prossed* he requested complainant to remain in Virginia in order that they might operate the farm jointly; that complainant's response to this request was: "Jennings, I wouldn't stay around here among the people here at all and be sneered at and flouted around by them. I have got a good job and I am going back to it, and I would love to sell my interest in it (the estate)"; that he offered to sell him his interest for $5,000 and he accepted the offer; that he obtained the sum of $2,000 by a further loan and paid it to complainant who used a part of it to complete the payment of his obligations; that the $3,000 note of complainant's was assumed and paid by respondent, and that this sum, plus the $2,000, constituted the $5,000 consideration mentioned in the deed.

Respondent testified that he purchased his brother's interest outright and at the price named by complainant; that at no time was there any mention of the trust agreement as alleged. He further testified that after the deed had been recorded complainant returned to Indiana, and while he made several visits back to Virginia, he did not mention the transaction until October, 1951, at which time he presented respondent an unsigned note dated August 1, 1950, in the amount of $14,730, which complainant then claimed to be the balance due him for his interest in the estate. He requested respondent to sign the note, which request was refused.

It will be observed that the note for $14,730, plus the $5,000 consideration in the deed, placed complainant's valuation on his share in the estate, both real and personal, at $19,730.

In addition to the related evidence, five prominent citizens testified to the good character of respondent and to his good reputation for truth and veracity.

This was the case presented on the pleadings, and the related testimony was the only evidence submitted relevant to the issue made.

In order to establish a parol trust in Virginia, "the declara-

tion must be unequivocal and explicit and must be established by clear and convincing proof." Minor on Real Property, (Ribble), Second Ed., Volume II, § 1192, p. 1592; *Brame* v. *Read*, 136 Va. 219, 118 S. E. 117. Complainant having failed to carry the burden imposed, the chancellor properly dismissed the bill.

"An allegation in a bill of a material matter and a direct denial of that allegation in the plea or answer, frame an issue of fact. * * * If the defense introduced by a plea (or answer) is good in law *the only issue in the case is the truth of the plea.*" (Italics supplied) 30 C. J. S., Equity, § 438, p. 844.

Sensing his failure to carry the burden of proof on the issue joined, complainant completely abandoned the case made by the pleadings and sought to prove the value of the estate, the inequity of the transaction, the trust relationship presumably existing between the parties, and that complainant was under duress by virtue of the pending indictments, all of which he presently contended enabled respondent to drive an unconscionable bargain with him. Such evidence, not being responsive to the issue joined, was objected to by respondent as "wholly irrelevant, immaterial and inadmissible".

The majority opinion says: "Had the defendant objected in the trial court that plaintiff's evidence did not conform to the allegations of the bill he could have compelled the plaintiff to allege with more exactness the grounds of his claim. This the defendant did not do, but elected to meet the plaintiff on the evidence introduced; and he stated in his brief: 'The sole question at issue is whether the sale by the appellant to the appellee was induced by fraud, either actual or constructive.' Therefore he can not now complain if the evidence in this equitable proceeding shows that the relief prayed should be granted."

The record in the case does not show that the respondent "elected to meet the plaintiff on the evidence introduced". On the contrary, it does show that the respondent repeatedly objected to evidence not relevant to the issue made by

the pleadings. He could do no more. Certainly the sole issue attempted to be presented *on the appeal* by complainant was the constructive fraud case—but this was not the case made in the trial court. Respondent urges in his brief that the "Attention of the Court is again directed to the fact that the allegations contained in the bill of complaint purport to assail the alleged deed on the ground that it was intended as a mere encumbrance, rather than a bona fide deed of bargain and sale. Apparently, this theory has been abandoned by the appellant * * * ."

The majority opinion continues: "Unlike most of the evidence in the case, this testimony was not only uncontradicted but counsel for the defendant made no effort to contradict it, *merely objecting that such evidence of value was not 'material' to any issue in this cause, is wholly irrelevant, immaterial and inadmissible.'* " (Italics supplied)

It was not incumbent upon the respondent to *contradict* complainant's evidence on irrelevant matters. The value of the land and other irrelevant testimony as stressed in the objections, was not material to the issue and was "wholly irrelevant, immaterial and inadmissible." It was impossible for respondent to make his position more plain.

The depositions in the case were taken before a notary public and not in open court. It is obvious from the record that the attorney for complainant took full advantage of this situation by the introduction of irrelevant testimony.

The opinion of the majority is based upon complainant's "change of face", that is, upon his contention, pointed up in his assignment of error, that the court should have held that the consideration of $5,000 received by complainant was "so grossly inadequate and unconscionable as to warrant the court in seizing upon the confidential relationship of the parties, the oppression of the vendor, the fraud and deceit in the failure of the vendee to disclose the extent and the value of the properties and effects being received by him, and the conditions existing making it certain that the parties did not deal on terms of equality".

The assignment embraces the heart of the decision of the majority, and it presents a new case which the learned chancellor in the court below has never been called upon to decide.

The chancellor had no right to consider evidence at variance with the pleadings. *Leffers* v. *Hayes*, 64 N. E. (2d) 768, 327 Ill. App. 440; *Colp* v. *First Baptist Church, Etc.*, 260 Ill. App. 269, affirmed 173 N. E. 67, 341 Ill. 73, 71 A. L. R. 106; *Jones* v. *Costlow*, 47 A. (2d) 259, 354 Pa. 245; *Medlinsky* v. *Premium Cut Beef Co.*, 57 N. E. (2d) 31, 317 Mass. 25; *Steinberg* v. *New York Life Ins. Co.* 188 N. E. 152, 263 N. Y. 45.

"The very object of pleadings requires that the parties be confined to the matters contained therein, and therefore *no evidence will be considered except that relating to matters alleged in the bill or answer and in issue.*" (Italics supplied) 30 C. J. S., Equity, § 444, p. 847; *Andrews* v. *Drake*, C. C. A. Mich., 83 Fed. (2d) 767, Cert. denied 57 S. Ct. 35, 299 U. S. 572, 81 L. ed. 421.

"In accord with the rule governing at law, the proof in a suit in equity must conform or correspond to the pleadings, for he must succeed, if at all, on the case made by the pleadings." 30 C. J. S., Equity, § 445, p. 848.

Courts of equity are and should be liberal in permitting amendments to bills. Rule 2:12 provides: "* * * Leave to amend *shall be liberally granted* in furtherance of the ends of justice." (Italics supplied) (But see Lile's Equity Pleading and Practice, § 147, pp. 83, 84) No amendment was sought in this instance and therefore the issue presented was circumscribed by the bill and answer as originally filed.

Evidently the majority undertakes to assume jurisdiction over the new case under the prayer for general relief. But such a prayer was never intended to embrace a case not contemplated by the bill.

"* * * (T)he court will not grant under the general prayer relief * * * *which rests on grounds not asserted in the bill.*" (Italics supplied) 19 Am. Jur., Equity, § 227, pp.

181, 182; *Williams* v. *Jackson,* 107 U. S. 478, 27 L. ed. 529, 2 S. Ct. 814; *English* v. *Foxall,* 2 Pet. (U. S.) 595, 7 L. ed. 531; *Vila* v. *Grand Island, etc. Co.,* 68 Neb. 222, 94 N. W. 136, 97 N. W. 613, 63 L. R. A. 791, 110 Am. St. Rep. 400, 4 Ann. Cas. 59.

"Under the prayer for general relief, the court may grant any relief to which the material facts and circumstances *put in issue by the bill,* and sustained by the proofs, entitle the plaintiff. But such relief must be consistent with the case made." Lile's Equity Pleading and Practice, *supra,* § 118, p. 70, citing *McGowan* v. *Parish* (D. C.) 237 U. S. 285, 35 S. Ct. 543, 59 L. ed. 955; *Hurt* v. *Jones,* 75 Va. 341, 352; *Woolfolk* v. *Graves,* 113 Va. 182, 69 S. E. 1039, affirmed on rehearing 113 Va. 182, 73 S. E. 721.

In *Hiern* v. *Mill,* 13 Ves. R. 114 (cited in 1 Dan. Ch. Prac. 380) Lord Eldon said: "The rule is that *if the bill contains charges,* putting facts in issue that are material, the plaintiff is entitled to the relief which those facts will sustain, under the general prayer, but he cannot desert the *specific* relief prayed, and under the general prayer ask specific relief of another description, unless the facts and circumstances *charged by the bill* will, consistently with the rules of court, maintain that relief." (Italics supplied).

"The test of the relief to be granted is not *the case proved,* but *the case stated in the bill upon which the issue is made up.*" *Hurt* v. *Jones, supra,* 75 Va., at p. 353.

Again referring to Lile's Equity Pleading and Practice, Chapter 1:

"Equity procedure may be better understood through a knowledge of the purpose, and a conviction of the necessity of fixed rules and methods for all judicial proceedings. Judge Story has thus admirably expressed the function and operation of these rules in his classic treatise on Equity Pleadings:

' " 'It is obvious that in every system of jurisprudence professing to provide for the due administration of public justice, some forms of proceeding must be established to

bring the matters in controversy between the parties who are interested therein before the tribunal by which they are to be adjudicated. And for the sake of the dispatch of business, as well as for its due arrangement with reference to the rights and conveniences of all the suitors, many regulations must be adopted to induce certainty, order, accuracy and uniformity in these proceedings. * * *

" 'Indeed, * * * there are many rules altogether founded in artificial reasoning, but which nevertheless may be affirmed, with few exceptions, to be greatly promotive of public justice and subservient to private convenience. If, here and there, any of them work an apparent hardship or mischief, it will, on close examination, be found that they also accomplish much general permanent good; and in this respect they partake only of the infirmity of all general rules, which must, in particular cases, give rise to some inequalities and shut out some individual equities and rights.' " (Story's Eq. Pleading, §§ 1, 2.)

Paraphrasing Judge Burks' opinion in *Hurt* v. *Jones*, *supra*, (75 Va., at p. 351), there is not in the whole bill, from the beginning to the end, the remotest allusion to or the faintest intimation of a fiduciary relationship existing between the parties, and nowhere is it suggested or intimated that the deed should be revoked on the ground of constructive fraud thus sought to be established. The sole issue raised by the pleadings was whether the deed as executed by W. C. Owens was security to save respondent harmless as alleged by complainant, or an absolute deed as claimed by respondent.

Extending to complainant all the indulgences which the most liberal rules of practice of this day would warrant, it is impossible, without a total disregard of the plainest and most essential principles of pleading, to grant him the special relief presently requested, based on the reasons now assigned. This is true, even though the complainant might be entitled to such relief in a proper case, on which we ex-

press no opinion, as such a case has never been developed nor decided in the court below.

"No court can base its decree upon facts not alleged, nor render its judgment upon a right, however meritorious, which has not been pleaded and claimed." *Potts* v. *Mathieson Alkali Works*, 165 Va. 196, 207, 181 S. E. 521, 525; *Patterson* v. *Anderson*, 194 Va. 557, 569, 74 S. E. (2d) 195, 203.

The decision of the majority is based upon an *untried* case involving a type of constructive fraud which was never pleaded but presumably practiced upon the complainant by respondent. The bill nowhere alleges such fraud, and "since fraud is never presumed in equity it must be *distinctly* and *specifically* charged in a bill seeking relief on that ground." (Italics supplied) 30 C. J. S., Equity, § 225, p. 677.

I see no necessity for going into the merits of the case considered in the majority opinion. We have no right to surmise as to how this constructive fraud case would have developed had complainant properly alleged such in his bill. We have no means of knowing how respondent would have answered such an allegation if properly pleaded, nor do we know how the proof on the issue thus made would have developed. Suffice it to say that no such case was presented to the chancellor in the court below and, as I conceive our duty, it is beyond our province to construct and decide it here.

We said in *Liverpool, Etc. Ins. Co.* v. *Bolling*, 176 Va. 182, 194, 10 S. E. (2d) 518, 523: "This is an appellate court, and on appeal we hear cases upon the theory upon which they were tried in the court below. The case there made is the case we hear on appeal."

Chief Justice Marshall said in *Marbury* v. *Madison*, 1 Cranch 137, 175: "It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, *and does not create that cause.* * * *" (Italics supplied)

Judge Buchanan, in *Warren* v. *Warren*, 93 Va. 73, 74, 24 S. E. 913, said:

"The parties must stand or fall upon the case as made in that (the trial) court. *An appellate court is not a forum in which to make a new case.* It is merely a court of review to determine whether or not the rulings and judgment of the court below *upon the case as made there* were correct. Any other rule, it has been well said, would overturn all just conceptions of appellate procedure in cases at law, and would result in making an appeal .in such action a trial *de novo*, without * * * the means of correcting errors and omissions." (Italics supplied)   See also *Jackson* v. *C. & O. R. Co.*, 179 Va. 642, 651, 20 S. E. (2d) 489, 493.

The concurring opinion filed, in an effort to extricate the majority from its rather hapless position, also attempts to ignore the case submitted in the trial court. This opinion concurs with the majority in the admission that the case there tried utterly failed. But the concurring opinion asserts: "As I read the record, both parties clearly understood the issue upon which the case had been heard and decided in the lower court and what issue was to be determined on appeal." Such a conclusion is untenable in the face of this record.

A. J. Owens, the respondent, had vigorously protested and objected to the admission of the irrelevant evidence introduced before the notary and he did not attempt to controvert same for the reason that it was irrelevant and immaterial to the issue joined. This is conceded in the majority opinion.

Furthermore, in his brief filed with us, respondent repeatedly calls our attention to the fact that W. C. Owens has abandoned the case alleged in the bill and is thus attempting to try a new case on appeal.

The majority opinion is critical of respondent for not meeting the *irrelevant* evidence taken before the notary and the concurring opinion now seeks to condemn him for asserting in his brief that he has not defrauded his brother.

Both opinions seek to place a "Halo of Equity" around the head of complainant. Such, I think, hardly fits the brow of this fugitive from justice who nowhere attempts to deny that he deliberately attempted to perpetrate a fraud upon respondent when he conveyed the property to him under the representation that he was unmarried, thus leaving the same subject to his wife's dower interest. The majority nowhere undertakes to wash his "unclean hands."

Upon the record made I feel that the chancellor was powerless to do other than dismiss the bill.

.HUDGINS, C.J., and SPRATLEY, J., join in this dissent.