PRINCE WILLIAM PROFESSIONAL BASEBALL CLUB, INC. t/a Prince William Cannons Baseball Club, Plaintiff,

v.

Francis BOULTON, Defendant.

Civ. A. No. 94–19–JJF.

United States District Court, D. Delaware.

April 13, 1995.

Anthony G. Flynn, and Timothy Jay Houseal, Young Conaway Stargatt & Taylor, Wilmington, DE, Price O. Gielen, and Cynthia L. Leppert, Neuberger Quinn Gielen Rubin & Gibber, Baltimore, MD, for plaintiff.

Roger A. Akin, Sawyer & Akin, Wilmington, DE, for defendant Boulton.

### *MEMORANDUM OPINION*

FARNAN, District Judge.

## I. *INTRODUCTION*

Plaintiff Prince William Professional Baseball Club ("Cannons" or "Plaintiff") brought this action against Defendants Francis Boulton ("Boulton" or "Defendant"), Harrelson Sports Group Limited Partnership ("Harrelson"), and Kenneth Shepard ("Shepard") asserting various breach of contract claims. Plaintiff has settled claims against Defendants Harrelson and Shepard. Thus, Boulton is the only remaining Defendant in this action.

Presently before the Court is Plaintiff's Motion for Partial Summary Judgment on Count I of the Second Amended Complaint. (D.I. 62) In Count I of the Second Amended Complaint, Plaintiff seeks a declaration that Boulton breached a Non–Competition Agreement between the parties. The allegedly breached agreement concerns the sale of Boulton's interest in the Cannons baseball franchise.

Defendant Boulton makes three arguments in response to Plaintiff's assertions. First, Defendant disputes that a violation of the Non–Competition Agreement occurred. Second, Defendant argues that he did not breach the Agreement because the agreement was an installment sales contract, not a non-competition agreement. Defendant finally argues that enforcement of the Agreement as written would amount to a penalty in violation of Virginia law. Both parties agree that Virginia law governs the issues in this case.

Because the Court finds that no genuine issues of material fact exist regarding the alleged violation of the parties' Non–Competition Agreement, the Court will consider Plaintiff's Motion for Partial Summary Judgment on its merits.

## II. *FACTS*

### A. *Sale of the Franchise*

Prior to October 1992, Defendant Boulton, through his part ownership in the Mundek Baseball Corporation, owned with Arthur Silber a controlling interest in the Prince William Cannons. (*See* Second Amended Complaint ¶¶ 8–9; Defendant's Answer ¶¶ 8–9) In October, 1992, Boulton entered into a set of agreements with Silber designed to effectuate the sale of Boulton's interest in the Prince William Cannons to Silber (*See* Second Amended Complaint ¶ 10; Defendant's Answer ¶ 10). Carolina League rules prohibit individuals from simultaneously having ownership interests in two teams in the league (*See* Boulton Decl. ¶ 8) and Boulton wished to pursue an ownership opportunity with a different franchise in the league. Thereafter, Boulton purchased a controlling interest in the Harrelson Sports Group Limited Partnership. (*See* Second Amended Complaint ¶ 10; Defendant's Answer ¶ 10) The Harrelson Group purchased a minor league baseball franchise, the Peninsula Pilots, based in Virginia. The Pilots franchise was eventually moved to Wilmington, Delaware, and renamed the "Wilmington Blue Rocks." (*See* Boulton Decl. ¶ 7)

Part of the Boulton–Silber Agreements is a Non–Competition Agreement. Specifically, the Non–Competition Agreement contains a section also captioned Non–Competition Agreement that states Boulton shall not:

except with respect to baseball players who have ever been or shall be under contract with the [Cannons Baseball Club] directly or indirectly, as a principal, partner, shareholder, agent, director, employee, consultant, or in any other capacity whatsoever, employ, retain, or enter into any employment, agency, consulting or other similar arrangement with, any person who, within the twelve month period prior to such employment, retention or arrangement, was an employee of the [Cannons Baseball Club], or of any affiliate, or, induce or attempt to induce any employee of the [Cannons Baseball Club], or of any affiliate, to terminate his employment with [the Cannons Baseball Club], or with any affiliate.

Section 1.1.4, Non–Competition Agreement.

### B. *Conduct of the Parties from November 1992 to January 1993*

The sale of Boulton's interest occurred on October 15, 1992. At the time of the sale, the Cannons' General Manager was Kenneth Shepard ("Shepard"). (*See* Plaintiff's Opening Brief, D.I. 63 at 12; Defendant's Answering Brief, D.I. 75 at 16) As an employee of the Cannons on October 15, 1992, Shepard was a person contemplated by the Non–Competition Agreement and thus restricted from working for the Blue Rocks in any capacity for one year after his separation from the Cannons organization. (*See* § 1.1.4, Non–Competition Agreement) However, the virtually undisputed facts established in this litigation to date clearly demonstrate that Shepard was involved with efforts by Boulton to organize the Wilmington Blue Rocks Baseball Club. Specifically, the record demonstrates that Shepard acted in a consulting capacity to the Wilmington Blue Rocks from November 1992 until January 25, 1993. During this time, substantial interaction occurred between Shepard and members of the Blue Rocks organization.

The relationship between Shepard and the Blue Rocks began in September or October of 1992 when Shepard and Boulton engaged in a discussion regarding Shepard taking a

position with the Wilmington Blue Rocks. (*See* Shepard Deposition, D.I. 64 at A–16–18) At that time, Boulton indicated he could not agree to hire Shepard unless Shepard arranged a waiver of Boulton's obligations under the Non–Competition Agreement with Silber. (*Id.* at A–19) Shepard understood that he would be welcomed to the Blue Rocks organization if he successfully negotiated such a waiver. (*Id.*)

Shepard then approached Silber and asked him if he would waive Boulton's obligations under the Non–Competition Agreement. Silber refused to release Shepard or Boulton from the provisions of the Agreement. (*Id.* at A–17) As a result of Silber's refusal, Shepard was prohibited from working for the Blue Rocks during the stipulated one year period. Despite Silber's refusal, Shepard spent between ten to fourteen days in Wilmington between November 1992 and January 1993. (*Id.* at A–22) Shepard stated that the purpose of these visits was to "lend my advice to [Blue Rocks officials] on what I knew from my years in baseball as to what would be good things to do or not to do." (*Id.*) Shepard also testified that Boulton knew about some of his trips to Wilmington. (*Id.*)

In early November 1992, Boulton introduced Shepard to Matt Minker, a Blue Rocks limited partner, with the purpose of getting the Blue Rocks "off on the right foot." (*See* Minker Deposition, D.I. 79 at A–80) Shepard met with Minker several times between November 1992 and January 1993. (*See* Shepard Deposition at A–28; Minker Deposition at A–82) During this period, Shepard also met with Chris Kemple, the general manager of the Blue Rocks and Dave Oster, the assistant general manager of the Blue Rocks. (*See* Shepard Deposition at A–27, A–20; Kemple Deposition, D.I. 79 at A–66–67) On these trips, Shepard offered advice regarding all aspects of "baseball operations." (*See* Shepard Deposition at A–28; Kemple Deposition at A–66)

Shepard further assisted the Blue Rocks organization in a variety of different ways between November 1992 and January 1993. For instance, he assisted Chris Kemple with creation of the Blue Rocks' budget program,

(Shepard Deposition at A–48–49), and also performed the following functions: instructed a Cannons' employee to direct recruits to the Wilmington Blue Rocks; assisted in the preparation of playing schedules for the Blue Rocks; and provided instruction to Blue Rocks' employees on how to organize community relations programs. (*Id.* at A–39–42, A–44)

In addition to the above contacts, Shepard also spoke with Boulton on the telephone numerous times between December 1992 and January 1993, (*Id.* at A–29, A–37; Boulton Deposition D.I. 79 at A–29), and both Shepard and Boulton acknowledge that Shepard accompanied Boulton to a meeting with representatives of Wilmington Trust Company. (Shepard Deposition at A–29, A–37; Boulton Deposition at A–47)

Further, Blue Rocks Ticket Director Andrew Layman testified that he saw Shepard in the Blue Rocks' offices two or three times between November 1992 and January 25, 1993. (*See* Layman Deposition, D.I. 64 at A–56) Layman understood Shepard's role was to provide assistance to the Blue Rocks organization in getting started with operations in Wilmington. (*Id.*) Layman specifically referred to Shepard's participation in a meeting involving computer problems and ticketing issues. (*Id.* at A–58)

Blue Rocks Director of Finance Craig Bailey testified that Shepard was involved with Blue Rocks' endeavors at a time when Shepard was still employed as general manager of the Cannons. Bailey testified that he saw Shepard in Wilmington three to four times between December and January. (*See* Bailey Deposition at A–66) Bailey confirmed that Shepard stayed at the Wilmington Holiday Inn under an agreement the Blue Rocks had with the hotel. (*Id.* at A–67) Additionally, Bailey testified that Shepard helped him to secure his position as Director of Finance, a management level post with the Blue Rocks organization. (*Id.* at A–60–62)

**C. *Shepard's Conduct After Termination from Employment with the Prince William Cannons in January 1993***

The Prince William Cannons terminated Shepard from his position as general manag-

er on January 25, 1993. (*See* Shepard Deposition at A–9) Under the Non–Competition Agreement, Shepard was prohibited from employment with the Blue Rocks for one year from the January 25 date. The day after his termination as general manager for the Cannons, Shepard was hired as a consultant for Volume Services, a concession supplier for the Wilmington Blue Rocks. (*Id.*)

During his tenure as a consultant for Volume Services, Shepard met with Craig Bailey, Director of Finances for the Blue Rocks. Bailey testified that he reviewed the Blue Rocks' finances primarily with Shepard. (*See* Bailey Deposition at A–69–71) Additionally, Shepard handled various personnel matters for the Blue Rocks including the promotions and salary increases of Blue Rocks employees. (*See* Hill Deposition, D.I. 64 at A–82–83) Although Shepard was employed by Volume Services, Kemple testified that Shepard could be found in the Blue Rocks' offices on a daily basis. (*See* Kemple Deposition at A–69) In sum, Shepard's role with the Blue Rocks remained unchanged when he took the job as a Volume Services consultant. (*Id.*) He remained involved in all aspects of Blue Rocks baseball operations, (*Id.*), and he also continued his contacts regarding Blue Rocks business with Boulton. (*Id.*)

In January 1994, when the one year non-competition period expired, the Blue Rocks offered Shepard a job as the Vice President for Baseball Administration. As such, Shepard was responsible for overseeing the entire operation of the Blue Rocks. As the Blue Rocks Vice President, Shepard's duties included supervision of the Blue Rocks' general manager. (*See* Shepard Deposition at A–14)

Boulton responds to the Cannon's factual assertions by disclaiming any knowledge of Shepard's activities. (*See* Boulton Decl. ¶ 18)

In his Declaration submitted in conjunction with the instant motion, Boulton has sworn that any activity Shepard pursued during the relevant time period was performed "wholly of his own volition...." (*Id.*) Boulton claims that he learned of Shepard's activities only after Shepard performed the services. Thus, regarding Shepard's work with Craig Bailey, Andrew Layman and other Blue Rocks' employees, Boulton states that he simply was not aware of Shepard's conduct. (*Id.*)

Boulton did admit in his deposition testimony that Shepard accompanied him to a meeting at the Wilmington Trust Company. (*See* Boulton Deposition at A–47–48) However, Boulton testified that he instructed Shepard not to say or do anything at the meeting. (*Id.*) Boulton contends that Shepard passionately wished to accompany him to the meeting, and he simply accommodated Shepard's wishes in order to manage a bad situation. (*Id.* at A–47)

At a minimum, Boulton's admission regarding the Wilmington Trust meeting demonstrates his personal interaction with Shepard concerning Blue Rocks business during the non-competition period. Certainly, conversation regarding the purpose of the meeting and its relevance to the Blue Rocks organization must have been exchanged for Shepard to have an understanding about the subject of the meeting and thereafter to have a "passion" to accompany Boulton.

Boulton also acknowledged in his testimony that Shepard introduced him to Dave Oster, the individual who would later become the assistant general manager of the Blue Rocks. (*Id.* at A–34) Additionally, Boulton admitted to several telephone conversations he had with Shepard, (*Id.* at A–29), and admitted that he knew Shepard visited the Wilmington Blue Rocks' office between November 1992 and January 1993. (*Id.* at A–36–37)

### III. *DISCUSSION*

The Court must address three issues to resolve Plaintiff's Motion for Partial Summary Judgment. First, the Court must determine whether the clause at issue is part of a valid non-competition agreement, as Plaintiff claims, or whether the clause is actually an installment sales contract, as argued by Boulton. Next, if the clause is a valid non-competition agreement, the Court must decide if Plaintiff has adduced sufficient undisputed facts to establish that Boulton breached the non-competition agreement. Lastly, if a breach is established, the Court must de-

termine whether the abrogation of Plaintiff's obligation to pay Boulton is an illegal penalty under Virginia law.

## A. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). An issue is genuine only if the evidence is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In *Celotex Corp. v. Catrett,* the Supreme Court held that, "[t]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1985). Any doubts that exist as to the existence of a genuine issue of material fact are to be resolved against the moving party. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 900 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

## B. *Validity of the Non–Competition Agreement*

■ The sale of Boulton's interest in the Cannons took place on October 15, 1992. As part of the documents utilized to consummate the transaction, the parties included a document entitled "Non–Competition Agreement" which contained a section entitled Non–Competition Agreement. Boulton now claims that the "Non–Competition Agreement" clause is not a non-competition agreement.

Essentially, Boulton contends that the Non–Competition Agreement was an installment sale contract which Boulton agreed to in order to assist his business partner and friend, Silber.

Boulton argues the agreement was styled as a non-competition agreement only for the purpose of facilitating Silber's ability to achieve a favorable tax result by expensing the payments from Silber to Boulton through the year 1999 against the Cannons' yearly revenues. For this reason, Boulton argues that the Agreement is ambiguous and extrinsic evidence must be admitted to show the actual intent of the parties. Boulton contends the Court must go beyond the four corners of the contract, claiming that the Non–Competition Agreement is fraught with ambiguity. In support of his theory, Boulton points out that Shepard "is not and has not been competing with the Cannons as a Volume Services employee." (*See* Defendant's Brief, D.I. 75 at 25) Boulton argues that the Blue Rocks and the Cannons "operate in widely divergent geographic areas ... [and] there is no evidence that fan allegiance is torn between the two teams." (*Id.*) Because of this, Boulton asserts that the Blue Rocks and Cannons do not compete with each other and, therefore, the subject clause could not have been intended to be a non-competition agreement.

On the record before it, the Court concludes that Boulton's claim regarding ambiguity in the Agreement language is disingenuous. The plain language of the Non–Competition Agreement does not require the Cannons to demonstrate competitive activity with the Blue Rocks to effectuate the terms of the subject clause. Boulton's thesis that the Cannons must show an actual competition between the Cannons and Blue Rocks to prove that the subject clause was intended as a non-competition agreement is, to put it politely, strained. The Non–Competition Agreement only requires Plaintiff to show that one of the prohibited acts or events occurred within the proscribed time period. The Court does not find any ambiguity in the language or terms of the Agreement that would conceivably support a finding of ambiguity and the admission of extrinsic evidence to ascertain the intent of the parties.[1]

---

1. Boulton further argues that several terms of the Agreement demonstrate that it is an installment sales contract. Boulton asserts that the floating interest rates, balloon payment, and due on sale clause support this contention.

Virginia contract law sets forth the general principle that the plain meaning of an agreement will be enforced "[w]here an agreement is complete on its face and is plain and unambiguous in its terms...." *Lerner v. Gudelsky,* 230 Va. 124, 334 S.E.2d 579, 584 (1985). A court will not, indeed, it can not, "search for its meaning beyond the instrument itself." *Id.; see also Blunt v. Lentz,* 241 Va. 547, 404 S.E.2d 62, 64 (1991) (where language is plain and unambiguous, intent of parties is ascertained by four corners of agreement).

Thus, the Court concludes that the Agreement between Boulton and Silber is clear and unambiguous. As an experienced business person, Boulton realized the consequences of entering into a written contract that contained a "non-competition agreement" and cannot now complain about its existence or enforcement.

For these reasons, the Court concludes that the Non–Competition Agreement is valid and binding.

## C. *Breach of the Agreement*

### 1. Arguments of the Parties

■ The Court must next determine whether Boulton breached the non-competition provision. The Cannons assert that there is no genuine dispute of fact and on the record that has been established, it is clear that Plaintiff is entitled to judgment on its breach of contract claim. In response, Boulton claims that he was unaware of any conduct which would violate the Non–Competition Agreement.

### 2. Analysis

Plaintiff provides substantial factual support for its assertion that Boulton breached the terms of the Non–Competition Agreement. The Agreement clearly sets forth certain prohibitions.[2] By signing the Agreement, Boulton agreed not to employ, in any capacity, any person affiliated with the Cannons within the twelve months immediately preceding the person's employment by Boulton. (*See* Non–Competition Agreement Section 1.1.4)

On the record presented, the Court finds that Shepard's activities, as described previously, constitute a relationship with the Wilmington Blue Rocks that is prohibited by the Agreement. Because Shepard was employed by the Cannons within the twelve month period immediately preceding his employment by the Blue Rocks, his employment clearly violates the terms of the Non–Competition Agreement.

---

The Court is unpersuaded by this argument. Providing terms for the payment of consideration does not determine the nature of the agreement.

2. Select provisions of the Non–Competition Agreement provide:

1.1 The Consultant shall not, for a period of seven (7) years following the date of the Agreement, without the Company's prior and specific written consent, engage in any of the following activities:

1.1.1 Directly or indirectly, as a principal, partner, shareholder, agent, director, employee, consultant, or in any other capacity whatsoever, engage, participate, invest or become interested in, affiliated or connected with, render services to, or, in exchange for any compensation or remuneration, direct or indirect, furnish any aid, assistance or advice to any person, corporation, firm or other organization engaged in, a business that has a baseball player development contract with the New York Yankees in the Carolina League or any baseball league that plays a full season with a single "A" designation by the National Association of Professional Baseball Leagues.

1.1.2 Interfere, directly or indirectly, with the conduct of the Business;

1.1.3 Except at the direction of the Company, and except as required by law or court order, divulge, use, disclose or furnish any trade secrets or any other confidential information concerning the Business, the company, or of any Affiliate;

1.1.4 Except with respect to baseball players who have ever been or shall be under contract with the [Cannons Baseball Club] directly or indirectly, as a principal, partner, shareholder, agent, director, employee, consultant, or in any other capacity whatsoever, employ, retain, or enter into any employment, agency, consulting or other similar arrangement with, any person who, within the twelve month period prior to such employment, retention or arrangement, was an employee of the [Cannons Baseball Club], or of any affiliate, or, induce or attempt to induce any employee of the [Cannons Baseball Club], or of any affiliate, to terminate his employment with [the Cannons Baseball Club], or with any affiliate.

The Court further finds that Boulton's response to the facts established by the Cannons is inadequate to bar the granting of summary judgment against him. Boulton does not in any way dispute the facts asserted by the Plaintiff. Instead, Boulton unconvincingly argues that he was unaware of Shepard's activities.

The Court views Boulton's response as dishonest and in contravention to the candid testimony of other key people in the Blue Rocks organization who all freely admitted to Shepard's activities with the club. Astonishingly, when confronted with the inexplicable presence of Shepard with him at the Wilmington Trust meeting, Boulton blames Shepard's "passion." It is difficult to understand how Boulton believes he can explain away what every other witness decently admits.

In sum, the Court finds that Boulton has not set forth any facts to rebut Plaintiff's exposition of Shepard's activities with the Blue Rocks. Shepard's interaction with the Blue Rocks management and day to day organizational efforts on behalf of the team is sufficient to convince the Court that (1) Shepard acted, at a minimum, in a consulting capacity to the Blue Rocks, and (2) Shepard was employed by the Cannons as their General Manager within the twelve months immediately preceding his retention by the Blue Rocks, all in violation of the Non–Competition Agreement. Thus, the Court concludes that as a matter of law, Boulton breached his Non–Competition Agreement with the Cannons.

### D. *Penalty Versus Appropriate Remedy*

■ Boulton has also claimed that even if the Court were to find that he breached the Non–Competition Agreement, Plaintiff must still pay him $650,000 as the remaining portion of the purchase price Plaintiff agreed to pay for Boulton's interest in the Cannons. Boulton argues that the $650,000 is a liquidated damages provision and, as such, he argues that dismissal of Plaintiff's obligation to pay it would amount to an illegal penalty against him under Virginia law.

Boulton argues that Virginia law is "clear when the parties fix a liquidated damages amount which is grossly disproportionate to actual damages. It is a tenet of Virginia law that when a stipulated damages figure would be grossly in excess of actual damages, courts will construe such provisions as unenforceable penalties." *See* Defendant's Brief, D.I. 75 at 29 (citing *Taylor v. Sanders*, 233 Va. 73, 353 S.E.2d 745, 747 (1987)).

The Court concludes that the $650,000 payment is not a fixed liquidated damages provision.

The language of the relevant clause is clear. Boulton was to receive the sum of $650,000 as part of the consideration for his interest in the Cannons, however, payment of the $650,000 was conditioned upon Boulton abiding by the requirements of the Non–Competition Agreement. This was an important provision for Plaintiff, who wished "to protect the value of the Cannons by protecting the management team which had been in place." *See* Plaintiff's Reply Brief, D.I. 78 at 13.

■ Virginia law provides that the courts will not "inquire into the adequacy of consideration." *Jessee v. Smith*, 222 Va. 15, 278 S.E.2d 793, 795 (1981). Additionally, courts do not have the ability to "relieve one of the consequences of a contract merely because it was unwise." *Id.* (quoting *Owens v. Owens*, 196 Va. 966, 86 S.E.2d 181, 186 (1955)). The extent of benefit or detriment will not be reevaluated by a court; parties are free to determine how much their respective promises are worth. *Brewer v. First National Bank of Danville*, 202 Va. 807, 120 S.E.2d 273, 279 (1961) ("It matters not to what extent the promisor is benefitted or how little the promisee may give for the promise"); *see also Walker v. Arrington*, 241 Va. 451, 403 S.E.2d 693, 695 (1991).

In this case, Boulton agreed to abide by the terms of the Non–Competition Agreement. The Court will not sit in judgment of the wisdom of this contractual term, but rather, the Court will simply enforce the term. In sum, the Court does not view the clause as a liquidated damages clause nor is there support for Boulton's contention that enforcement of the clause would amount to a penalty.

## IV. CONCLUSION

The Non–Competition Agreement is a valid and enforceable contractual provision between Boulton and the Plaintiff. Boulton breached the agreement by allowing Shepard to work for the Blue Rocks in a consulting capacity despite his employment by the Cannons in the preceding twelve months. Boulton has not created a genuine issue of material fact with his disclaimer that he lacked knowledge regarding Shepard's activities with the Blue Rocks. As a result, Boulton must bear the consequences of his breach, including loss of the $650,000. The Court will grant Plaintiff's Motion for Partial Summary Judgment on Count I of the Second Amended Complaint.

An appropriate Order has been entered.